**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* GEORGE KARTOZIA,<br><br>          Plaintiffs,<br><br>v.<br><br>FREEDOM MORTGAGE CORPORATION; R M K FINANCIAL CORPORATION d/b/a MAJESTIC HOME LOAN; MORTGAGE SOLUTIONS OF COLORADO, LLC; SUN WEST MORTGAGE COMPANY, INC.; LOANDEPOT.COM, LLC; SERVICE 1ˢᵗ MORTGAGE, INC.; ROBERT COLE; ARMOUR SETTLEMENT SERVICES, LLC; and CERTIFIED TITLE CORPORATION,<br><br>          Defendants. | Civil Action No.<br><br>_____<br><br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730(b)<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER**<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Relator, George Kartozia, on behalf of himself and the United States of America, and alleges as follows:

### I.   INTRODUCTION

1.

This is an action to recover damages and civil penalties on behalf of the United States of America ("United States" or the "Government") arising from false and fraudulent claims made and caused to be made by Defendants to the United States Department of Veterans Affairs ("VA") in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

<u>Defendants are Defrauding a VA-Guaranteed Mortgage Refinance Program</u>

2.

Defendants are mortgage lenders, brokers, and title companies who have defrauded, and continue to defraud, the United States by selling to veterans VA-backed refinanced mortgages with prohibited closing costs in direct contravention of Defendants' false certifications to the VA that such costs have not and will not be charged.  The VA program that Defendants primarily victimize is the **Interest Rate Reduction Refinance Loan Program** (the "IRRRL Program" or the "Program").  Interest Rate Reduction Refinance Loans ("IRRRLs") are home refinance loans that are guaranteed by the VA but made to the veterans by private lenders.  *See* 38 U.S.C. § 3710(a).[1]

3.

The IRRRL Program is specifically designed to allow veterans with VA-backed home mortgages to refinance those mortgages and take advantage of lower interest rates and shorter repayment terms without incurring the high costs of traditional refinancing.[2]  *See* 38 CFR §§36.4223 and 36.4313; VA Lenders Handbook – VA Pamphlet 26-7, Ch. 8, 8-2.  A central aspect of the Program involves minimizing the costs of refinancing to the veterans by restricting the amount and type of fees lenders can charge veteran borrowers in IRRRL closings.  *See* 38 C.F.R. § 36.4313.

---

[1] The IRRRL Program is part of the VA Home Loan Guaranty program that was created in 1944 by the 'GI Bill of Rights.'  *See* https://www.benefits.va.gov/REPORTS/abr/ABR-LoanGuaranty-FY16-02062017.pdf ("By providing loan guaranties, the government could aid Veterans in their efforts to readjust to civilian life.").
[2] IRRRLs are available to "veterans" and active duty Servicemembers.  *See* 38 U.S.C. § 3701(b)(4).   The term, "veteran" includes both former and current active duty Servicemembers in Title 38, the IRRRL Program rules and this Complaint.

2

4.

The VA *automatically* guarantees 25% of the amount of each IRRRL up to $417,000. *See* 38 U.S.C. § 3710.  Defendants know the VA's guaranty on each IRRRL will be forthcoming without any financial underwriting criteria whatsoever or any post-closing review by the VA of the refinanced loan's closing costs.

5.

The VA's guaranty is statutorily "incontestable" in the hands of innocent third-party "holders in due course" who buy bundled IRRRLs from Defendant Lenders on the secondary financial market.  *See* 38 U.S.C. § 3721.

6.

The incontestability of the VA's guaranty shifts credit risk from lenders to the VA and is an important financial inducement to private lenders to originate IRRRLs.    As stated by the U.S. Department of Justice, "the obvious purpose of the incontestability clause is to ensure the existence of a secondary market to purchase VA guaranteed loans, without which banks might cease to originate these loans entirely."  *See Mt. Vernon Cooperative Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966) ("The purpose of the incontestability clause is to stimulate bank and secondary market interest in veterans' loan paper."). Because the certificate of guaranty is its own "conclusive evidence" of the viability of the guaranty, 38 U.S.C. § 3721, there is no quantum or quality of evidence that can render the guaranties void."  United States Statement of Interest, filed November 30, 2016, in *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 1:06-cv-0547-AT, Docket No. 1187.

7.

According to the VA, "the overwhelming majority of VA-guaranteed loans (upwards of

98 percent) are sold in the secondary mortgage market with a full faith and credit guaranty from

the Government National Mortgage Association (GNMA or Ginnie Mae). GNMA's role in the

secondary market provides the necessary liquidity of capital so that lenders can then fund

additional mortgage loans (e.g., additional VA-guaranteed loans to Servicemembers and

Veterans)."  Statement of Jeffrey London, Director - Loan Guaranty Service, VA, before the

House Committee on Veterans' Affairs Subcommittee on Economic Opportunity, January 10,

2018 (hereinafter referred to as the "London VA Statement") at 2.

<u>The Central Role of Minimal Closing Costs</u>

8.

Given that the Government's purpose in creating IRRRLs is to provide veterans access to

less expensive mortgages with minimal closing costs, the VA explicitly limits what lenders may

charge an IRRRL borrower:

> **No charge shall be made against, or paid by, the borrower
> incident to the making of a guaranteed or insured loan other than
> those expressly permitted under paragraph (d) or (e) of this
> section, and no loan shall be guaranteed or insured unless the
> lender certifies to the Secretary that it has not imposed and will
> not impose any charges or fees against the borrower in excess of
> those permissible under paragraph (d) or (e) of this section.**

38 C.F.R. § 36.4313(a) (emphasis added.)

9.

The VA rule that governs what can and cannot be charged in closing costs to IRRRL

borrowers is 38 C.F.R. § 36.4313 (the "Limited Charges Rule").  The Limited Charges Rule

restricts the closing costs that lenders can charge veteran borrowers in both amount and type and

mandates explicit certifications of compliance with those restrictions from each IRRRL lender.

As detailed herein, each Defendant Lender makes a false and fraudulent statement to the VA

4

every time it certifies that the Lender has not and will not impose charges in excess of those permitted by the Limited Charges Rule.

10.

Each time a Defendant Lender closes an IRRRL, it prepares a "closing disclosure" for the borrower and for the VA.  The closing disclosures prepared by Defendant Lenders routinely include charges prohibited by the VA's Limited Charges Rule.  Prior to the use of the current closing disclosure form, Defendant Lenders used a similar disclosure form commonly referred to as a "HUD" settlement statement.

11.

Some of the prohibited closing costs routinely and knowingly charged by Defendant Lenders to veteran borrowers include, but are not limited to, attorneys' fees, inflated and/or duplicative "title examination" fees, "title search" charges, "title insurance" fees, title "closing coordination" fees, "title binder" fees, "recording" fees, or other "Government Fees" and "transfer taxes."  Defendants also charge veteran borrowers unallowable brokerage fees, which are routinely masked as "discount points" that do not actually buy down the applicable interest rate or secure a lower interest rate for the borrower.

12.

Each of the IRRRLs at issue in this case includes on the Lender's closing disclosure at least one unallowable charge not permitted by the Limited Charges Rule. These closing disclosures (1) evidence the falsity of Defendant Lenders' certifications that prohibited fees are not charged, which false certifications cause the submission of false claims to the VA in violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)A); and (2) constitute false records that are material to claims submitted to the VA in violation of the False Claims Act, 31 U.S.C. § 3729

5

(a)(1)(B).

13.

Many of the IRRRLs at issue in this case also include unallowable brokerage fees, which are falsely and deceptively called "discount points" and charged to the borrower on the closing disclosure.

14.

Defendants roll the unlawful charges and phony discount points into the principal loan amount of the IRRRL, fraudulently increasing the size of the VA's guaranty, which results in increased damages to the VA-guarantor, and ultimately the American taxpayers, when the IRRRLs go into default.

15.

For Defendants, IRRRLs are a vehicle utilized to fraudulently obtain high and unallowable fees and lucrative financial products at the expense of the veterans and the VA

16.

In addition to knowingly charging veteran borrowers prohibited closing costs, Defendants also violate the IRRRL Program rules by illegally structuring IRRRLs to give veteran borrowers cash proceeds as part of the refinance.[3]   The cash proceeds are an illegal but effective inducement to get the veteran to enter a fraudulently high cost refinance of his or her existing mortgage.

17.

The VA describes IRRRLs in simple and unambiguous terms on its website:

---

[3] Providing cash to borrowers at closing is permitted under a different type of VA refinance loan, which involves more financial underwriting requirements than an IRRRL and a review of the borrower's creditworthiness, as more fully discussed below.

| IRRRL Facts |
|---|
| • No appraisal or credit underwriting package is required when applying for an IRRRL. |
| • An IRRRL may be done with "no money out of pocket" by including all costs in the new loan or by making the new loan at an interest rate high enough to enable the lender to pay the costs. |
| • When refinancing from an existing VA ARM loan to a fixed rate loan, the interest rate may increase. |
| • No lender is required to give you an IRRRL, however, any VA lender of your choosing may process your application for an IRRRL. |
| • Veterans are strongly urged to contact several lenders because terms may vary. |
| • You may NOT receive any cash from the loan proceeds. |

https://www.benefits.va.gov/homeloans/irrrl.asp.

18.

IRRRLs are sometimes called "streamlined refinances" because they have fewer underwriting requirements than other types of refinance loans.  IRRRLs are available to veterans regardless of the borrower's credit worthiness; as a result, IRRRLs can close in a matter of weeks from first contact with the borrower.

19.

The borrower pays the VA a "funding fee" of 0.5% of the IRRRL amount at closing. The 0.5% VA funding fee is routinely rolled into the amount of the loan.  *See* https://www.benefits.va.gov/homeloans/irrrl.asp.  Disabled veterans are not required to pay the VA funding fee.  *Id.*  The VA reaps a significant amount of money from IRRRL funding fees.

7

20.

Given the explicit terms of the Limited Charges Rule, the Lender's certification of compliance with the Rule's restrictions on closing costs is inexorably tied to the VA guaranty of each and every IRRRL.  Indeed, If the IRRRL lender does not certify its compliance, the VA is prohibited from issuing the guaranty.  *See* 38 C.F.R. § 36.4313(a) ("no loan shall be guaranteed . . . unless the lender certifies to the [VA] that it has not imposed and will not impose any charges or fees against the borrower in excess of those permissible under paragraph (d) or (e) of this section.").  Thus, when Defendants falsely certify that prohibited fees have not and will not be charged to the veteran borrower, they are fraudulently obtaining access to the public fisc.

21.

Defendants knowingly charge veteran borrowers prohibited costs in IRRRL closings in direct violation of the Limited Charges Rule and regulatory limits imposed by Congress.  To gain access to these valuable and lucrative financial products, Defendant Lenders knowingly misrepresent to the VA their compliance with the IRRRL Program's rules and also create and submit false records to the VA to obtain the VA's guaranty. The VA relies on Defendant Lenders' false certifications  and false records in issuing IRRRL guaranties and subsequently incurs substantial costs when an IRRRL goes into default that never should have been guaranteed.  Of course, the veterans who pay the prohibited closing fees are victimized too, but their individual losses are not directly recoverable in this action under the False Claims Act.

<u>False Claims/Damages</u>

22.

The VA's damages due to Defendants' illegal schemes include all funds paid to claimants related to the VA's guaranties of IRRRLs that were fraudulently originated and closed by

Defendants and that have gone or will go into default.  Defendants cause the submission of false

claims when the VA-as-Guarantor incurs the substantial costs associated with protecting the loan

collateral from the point of a loan default in trying to protect the veteran from losing his or her

home to foreclosure.  If there is a foreclosure later, the VA damages grow as the must pay the

amount of the guaranty to the holder of the IRRRL.

23.

If the VA knew Defendants were charging prohibited closing costs to veteran borrowers,

the VA could not have lawfully guaranteed IRRRLs originated and closed by Defendants.  *See*

Limited Charges Rule, 38 C.F.R. § 36.4313.  The VA cannot knowingly participate in or ratify a

fraudulent closing that violates the VA's own regulations, Truth-In-Lending laws, 15 U.S.C. §§

1601, *et seq*., and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.*, in a

scheme that aggrieves veterans and the American taxpayers.  The VA cannot ratify or be

complicit in a crime against the very veterans they are charged with protecting.

24.

As a reference point, in the most recently completed VA fiscal year (October 2016 to

October 2017), the VA guaranteed 191,000 IRRRLs.  *See* London VA Statement at 1.  Further,

Defendant Lenders make up a significant percentage of the IRRRL market place. *See* VA FY

2017 Lender Loan Volume Reports, available at

https://www.benefits.va.gov/HOMELOANS/Lender_Statistics.asp.

25.

Once Defendants have fraudulently locked a veteran into an IRRRL, if the borrower

cannot make his or her payments and goes into default, the VA-guarantor must take steps to

protect the collateral.  The VA provides veteran borrowers "every opportunity to retain their

home or avoid foreclosure" and incurs substantial costs in doing so.

https://www.benefits.va.gov/BENEFITS/factsheets/homeloans/DelinquentLoanAssistance.pdf.

26.

Many of the IRRRLs fraudulently originated and closed by Defendants are sitting in the hands of holders in due course like time bombs waiting for the presentment of the claims for payment to the VA that often follow default, up to and including claims for payment on the fraudulently obtained guaranties.

27.

The value to the Government of the IRRRL Program is in the benefits our veterans receive from ostensibly getting into less onerous mortgages with lower interest rates and minimal closing costs.  The Government gets no value from the IRRRL Program when predatory lenders like Defendants use false certifications and false records to obtain the Government's guaranty and thus access to the public fisc only to abuse veteran borrowers by charging the very fees the Government's Program was designed to negate.  Moreover, in many instances the refinanced loan is not a less onerous mortgage at all.  As discussed herein, many times the loans are refinanced under interest rates and terms that harm the veteran borrowers.

28.

Defendant Lenders and their co-conspirators are liable to the United States for all damages resulting from the fraudulently obtained IRRRL guaranties, as well as penalties of between $11,181 and $22,363 for each false claim submitted or caused to be submitted to the VA.  *See* 31 U.S.C. § 3729(a)(1)(G).

## II. **PARTIES**

29.

The United States of America ("U.S." or "Government") paid, and will continue to pay, funds in response to claims for payment following defaults by veteran borrowers on IRRRLs that were fraudulently originated by Defendants, as fully described below.

30.

The *qui tam* relator, George Kartozia ("Relator" or "Mr. Kartozia"), is a licensed mortgage loan originator.  Relator worked as a loan officer for Defendant Broker Service 1st Mortgage ("Service 1st") in 2016.  In that capacity and later as a branch manager for Service 1st in 2017, Relator reviewed thousands of IRRRLs for veterans across the country funded by Defendant Lenders.  Relator personally brokered close to one hundred (100) IRRRLs with Defendant Lenders, Defendant Service 1st and Defendant Title Companies.  Relator is an insider with personal, in-depth knowledge of Defendants' conduct as alleged herein.

Defendant Lenders

31.

Defendant FREEDOM MORTGAGE CORPORATION (hereinafter referred to as "Freedom Mortgage") is a New Jersey corporation operating as a residential mortgage lender whose business includes the origination of IRRRLs guaranteed by the United States Government.  Defendant Freedom Mortgage, during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Freedom Mortgage maintains its principal place of business at 907 Pleasant Valley Avenue, Suite 3, Mount Laurel, New Jersey 08054 and may be served through its registered agent, CT Corporation System, at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

32.

Defendant R M K FINANCIAL CORPORATION d/b/a MAJESTIC HOME LOAN (hereinafter referred to as "Majestic") is a California corporation operating as a residential mortgage lender whose business includes the origination of IRRRLs guaranteed by the United States Government.  Defendant Majestic, during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Majestic maintains its principal place of business at 1819 S. Excise Avenue, Ontario, California 91761 and may be served through its registered agent, National Registered Agents, Inc., at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

33.

Defendant MORTGAGE SOLUTIONS OF COLORADO, LLC (hereinafter referred to as "Mortgage Solutions") is a Colorado limited liability company operating as a residential mortgage lender whose business includes the origination of IRRRLs guaranteed by the United States Government.  Defendant Mortgage Solutions, during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Mortgage Solutions maintains its principal place of business at 5455 N. Union Boulevard, Colorado Springs, Colorado 80918 and may be served through its registered agent, Corporation Service Company, at 40 Technology Parkway South #300, Norcross, Georgia 30092.

34.

Defendant SUN WEST MORTGAGE COMPANY, INC. (hereinafter referred to as "Sun West") is a California corporation operating as a residential mortgage lender whose business includes the origination of IRRRLs guaranteed by the United States Government.  Defendant Sun West, during all relevant times hereinafter described, did and does transact business in the

12

Middle District of Georgia.  Defendant Sun West maintains its principal place of business at 6131 Orangethorpe Avenue, Suite 500, Buena Park, California 90620 and may be served through its registered agent, Paracorp Incorporated, at 453 Hardy Ives Lane, Lawrenceville, Georgia 30045.

<div align="center">35.</div>

Defendant LOANDEPOT.COM, LLC (hereinafter referred to as "Loan Depot") is a Delaware limited liability company operating as a residential mortgage lender whose business includes the origination of IRRRLs guaranteed by the United States Government.  Defendant Loan Depot, during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Loan Depot maintains its principal place of business at 26642 Towne Centre Drive, Foothill Ranch, California 92610 and may be served through its registered agent, Registered Agent Solutions, Inc., at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, Georgia 30076.

<div align="center">36.</div>

Defendants Freedom Mortgage, Majestic, Mortgage Solutions of Colorado, Sun West, and Loan Depot are collectively referred to herein as "Defendant Lenders."

<div align="center">Defendant Brokers</div>

<div align="center">37.</div>

Defendant SERVICE 1st MORTGAGE, INC. (hereinafter referred to as "Service 1st") is a Maryland corporation operating as a mortgage brokerage firm specializing in the referral of IRRRLs to lenders.  Defendant Service 1st, during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Service 1st maintains its principal place of business at 1415 Madison Park Drive, Glen Burnie, Maryland 21601 and may

<div align="right">13</div>

be served through its registered agent, National Registered Agents, Inc., at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

38.

Defendant ROBERT COLE is an individual who, on information and belief, resides in Florida.  Defendant Cole owns Defendant Service 1st and was personally responsible for implementation of the fraud scheme at Service 1st.

39.

Defendant Service 1st and Defendant Robert Cole are collectively referred to herein as "Service 1st" or "Defendant Brokers."

Defendant Title Companies (a/k/a Closing Agents or Settlement Companies)

40.

Defendant ARMOUR SETTLEMENT SERVICES, LLC (hereinafter referred to as "Armour" or "Armour Settlement") is a Maryland limited liability company operating as a mortgage settlement services firm whose business includes closing IRRRLs.  Defendant Armour during all relevant times hereinafter described, did and does transact business in the Middle District of Georgia.  Defendant Armour Settlement maintains its principal place of business at 10220 South Dolfield Road, Suite 200, Owings Mills, Maryland 21117 and may be served through its registered agent, Business Filings Incorporated, at 289 S. Culver Street, Lawrenceville, Georgia 30046.

41.

Defendant CERTIFIED TITLE CORPORATION (hereinafter referred to as "Certified Title") is a Maryland corporation operating as a mortgage settlement services firm whose business includes closing IRRRLs.  Defendant Certified Title, during all relevant times

hereinafter described, did and does transact business in the Middle District of Georgia.

Defendant Certified Title maintains its principal place of business at 11459 Cronhill Drive, Suite

M, Owings Mills, Maryland 21117 and may be served through its registered agent, Corporation

Service Company, at 40 Technology Parkway South #300, Norcross, Georgia 30092.

42.

Defendants Armour Settlement and Certified Title are collectively referred to herein as

"Defendant Title Companies."

### III.  <u>JURISDICTION AND VENUE</u>

43.

This Court has jurisdiction over this *qui tam* action pursuant to 28 U.S.C. § 1331 and 31

U.S.C. §§ 3732(a) and 3730(b). Relator is an original source of the facts contained in this

Complaint and institutes this action in the name of the United States of America as provided in

the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

44.

Venue is appropriate in the Middle District of Georgia because each of Defendants

transacts business in this district.  *See* 28 U.S.C. § 1391(c).

45.

Prior to filing this action, Relator disclosed information to the United States as required

by the False Claims Act, 31 U.S.C. § 3730(b)(2).

### IV.  <u>APPLICABLE LAW</u>

<u>The False Claims Act</u>

46.

Defendants' conduct alleged herein violates the federal False Claims Act, 31 U.S.C. §§

3729-3733 (the "FCA").  The FCA was originally enacted during the Civil War to incentivize persons with knowledge of contractors defrauding the United States military to come forward and help the Government recover its losses.  Congress substantially amended the FCA in 1986 to further enhance the ability of the United States to recover losses sustained due to fraud.  Congress amended the FCA again in 2009 and 2010 to fill gaps in the coverage of the Act and to correct ambiguities and misinterpretations of the intended scope of the FCA that had emerged since the major 1986 amendments.

47.

From the 1986 amendments until May 20, 2009, the FCA prohibited, in relevant part: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" as well as (b) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. §§ 3729 (a)(1)-(2) (1986).

48.

Until May 20, 2009, a "claim" was defined under the FCA as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c) (1986).

49.

On May 20, 2009, the FCA was amended by the Fraud Enforcement and Recovery Act of

2009, Public Law 111-21 ("FERA").  Today the FCA imposes liability on any person who:

> (A)      knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;
>
> (B)      knowingly makes, uses, or causes to be made or used, a false record or statement
> material to a false or fraudulent claim;
>
> (C)      conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G). . . .

31 U.S.C. § 3729(a)(1).  Defendants have violated 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and

(a)(1)(C).

<div align="center">50.</div>

The 2009 amendments clarified what constitutes a "claim" under the FCA:

> (2) The term "claim" –
>
> > (A) means any request or demand, whether under a contract or otherwise,  for
> > money or property and whether or not the United States has title to the money
> > or property, that—
> >
> > > (i)      is presented to an officer, employee, or agent of the United States;
> > > or
> > >
> > > (ii)     is made to a contractor, grantee, or other recipient, if the money or
> > > property is to be spent or used on the Government's behalf or to
> > > advance a Government program or interest, and if the United
> > > States Government --
> > >
> > > > (I) provides or has provided any portion of the money or property
> > > > requested or demanded; or
> > > >
> > > > > (II) will reimburse such contractor, grantee, or other
> > > > > recipient for any portion of the money or property which is
> > > > > requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A) (2009).

<div align="center">51.</div>

The term "obligation" means "an established duty, whether or not fixed, arising from an

express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-

<div align="right">17</div>

based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

52.

The term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4) (2009).

53.

No specific intent to defraud the Government is required in order to violate the FCA.  31 U.S.C 3729(b)(1)(B).  The terms "knowing" and "knowingly" are specifically defined in the FCA to:

(A) mean that a person, with respect to information--

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;  . . . .

31 U.S.C. § 3729(b)(1)(A) (2009).

54.

Any person who violates the FCA is liable to the United States for a civil penalty of not less than $11,181 and not more than $22,363 per false claim made "plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1)(G).

55.

Relator alleges that Defendants' conduct prior and subsequent to the FCA amendments described above violated the FCA as it was and is in existence at the time of Defendants'

conduct.

56.

As an employee of Defendant Service 1st from May 2016 through August 2016 and again from May 2017 through October 2017, Relator learned of Defendants' fraudulent schemes and that the same scheme had been ongoing for years prior to his employment with Defendant Service 1st.  Thus, the relevant period is 2008 through the present day.  On information and belief, the IRRRL fraud schemes are ongoing.  The damage to the U.S. taxpayers has been substantial because of the orchestrated and fraudulent schemes described herein and will continue as more of Defendants' fraudulently originated and closed IRRRLs go into default.

The IRRRL Program

57.

As summarized above, Congress established the IRRRL Program to allow veterans with existing VA-backed mortgage loans to take advantage of more favorable borrowing terms while protecting those veterans from predatory lenders who would otherwise charge excessive fees to refinance those mortgages.  *See* 38 U.S.C. §§ 3702, 3709, and 3710; 38 C.F.R. § 36.4307; 38 C.F.R. § 36.4313.

58.

The IRRRL Program is designed to give veterans the opportunity to lower their current VA-backed mortgage loan payments via lower interest rates and/or shorten the mortgage repayment terms with minimal and expressly limited refinancing costs.  *Id.*

59.

The IRRRL Program involves a government guaranty of a percentage of the veteran's refinanced loan, which obligates the United States to pay monetary claims when an IRRRL goes

into default.  *See* 38 U.S.C. § 3703 (definition of "guaranty").

<div align="center">60.</div>

Defendant Lenders applied and received authorization from the VA to originate and close IRRRLs on an "automatic non-supervised" basis, which means Defendant Lenders originate and close IRRRLs without VA review or pre-approval of the loans or the closing terms.  *See* 38 U.S.C. § 3702(d); 38 C.F.R. § 36.4352; 38 C.F.R. § 36.4307; VA Form 26-8736; Lenders Handbook – VA Pamphlet 26-7.  The VA necessarily relies on the Defendant Lenders to follow the rules applicable to the origination and the closing of IRRRL loans.

<div align="center">61.</div>

However, if a veteran is delinquent on his existing VA mortgage loan, however, the lender must submit the IRRRL to the VA for pre-approval.  *See* 38 C.F.R. § 36.4340(g)(5). Tellingly, Defendant Brokers and Lenders refused to offer IRRRLs to delinquent borrowers because of the heightened VA scrutiny that would ensue.

<div align="center">Regulatory Limits on Closing Costs</div>

<div align="center">62.</div>

The IRRRL Program specifies the closing costs that lenders may charge to IRRRL borrowers:

(1)     The veteran may pay reasonable and customary amounts for any of the following items:

    (i)     Fees of Department of Veterans Affairs appraiser and of compliance inspectors designated by the Department of Veterans Affairs except appraisal fees incurred for the predetermination of reasonable value requested by others than veteran or lender.

    (ii)     Recording fees and recording taxes or other charges incident to recordation.

    (iii)     Credit Report.

<div align="right">20</div>

(iv)     That portion of taxes, assessments, and other similar items for the current year chargeable to the borrower and an initial deposit (lump-sum payment) for the tax and insurance account.

(v)      Hazard insurance required by [38 C.F.R.] § 36.4329.

(vi)     Survey, if required by lender or veteran; except that any charge for a survey in connection with a loan under [38 C.F.R.] §§ 36.4360 through 36.4365 (Condominium Loans) must have the prior approval of the Secretary.

(vii)    Title examination and title insurance, if any.

(viii)   The actual amount charged for flood zone determinations, including a charge for a life-of-the-loan flood zone determination service purchased at the time of loan origination, if made by a third party who guarantees the accuracy of the determination. A fee may not be charged for a flood zone determination made by a Department of Veterans Affairs appraiser or for the lender's own determination.

(ix)     Such other items as may be authorized in advance by the Under Secretary for Benefits as appropriate for inclusion under this paragraph (d) as proper local variances.

38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

63.

The closing costs that may be charged to the veteran borrower in an IRRRL closing are referred to hereinafter as "Enumerated Fees."

64.

The VA authorizes the lender to recoup its costs in originating an IRRRL by charging a flat fee that cannot exceed one percent of the loan amount (hereinafter referred to as the "1% Flat Charge"). *See* 38 U.S.C. § 3703(c)(1); 38 C.F.R. § 36.4313; Lenders Handbook – VA Pamphlet 26-7, Chapter 8, "Fees and Charges." The 1% Flat Charge is intended to cover all of the lender's costs and does not include fees specifically permitted to be charged to the borrower, i.e., Enumerated Fees. *See* 38 C.F.R. § 36.4313(d)(2) (the "flat charge shall be in lieu of all other

charges relating to costs of origination not expressly specified and allowed in this schedule"); *see also* Lenders Handbook – VA Pamphlet 26-7, Ch. 8, 8-2(d) (providing that lenders must cover the cost of any and all fees not specifically enumerated as an allowable itemized fee under 38 C.F.R. § 36.4313(d)(1) out of its flat charge).

65.

Thus, any charges on the closing disclosure that are not Enumerated Fees or charges that are Enumerated Fees but that are above reasonable and customary rates can only be assessed to the borrower as part of the 1% Flat Charge.  Relator's Complaint is narrowly focused on Defendants' IRRRLs in which the Lender has charged the borrower closing costs in excess of 1% of the loan amount (equal to the 1% Flat Charge) and unallowable fee(s) and/or excessive Enumerated Fees.

66.

Certain fees common to traditional refinancing are specifically not allowed to be charged to a veteran borrower participating in the IRRRL Program unless they are included in the 1% Flat Charge.  *See* 38 C.F.R. § 36.4313(d)(1).   Brokerage fees, such as those paid to Defendant Service 1st as detailed below, may not be charged to a veteran borrower outside of the 1% Flat Charge.  *See* 38 C.F.R. § 36.4313(b).  In addition, attorneys' fees associated with the IRRRL closing may not be charged outside of the 1% Flat Charge.  *See* 38 C.F.R. § 36.4313(d)(1).

## V.  <u>RELATOR'S INSIDER EVIDENCE REGARDING DEFENDANTS' FRAUD</u>

67.

As a loan officer employed by Service 1st from May 2016 to August 2016 and later as a Service 1st branch manager from May 2017 to October 2017, Relator worked exclusively with IRRRLs.   Relator worked closely with each Defendant Lender to procure and originate IRRRLs

on terms acceptable to the Lenders and with each Defendant Title Company.  Relator repeatedly
witnessed Defendant Lenders, Defendant Brokers, and Defendant Title Companies charging
veterans closing costs prohibited by the IRRRL Program.

<div align="center">68.</div>

Relator was trained to know that lenders control almost every aspect of an IRRRL, from
the interest rate available to the closing costs.  However, relator learned that lenders often need
brokers to connect them with veteran borrowers and title companies.   Lenders ultimately control
the IRRRL through their funding and underwriting authority.  Lenders are the entities that are
allowed to obtain VA guarantees after certifying they will follow the rules applicable to the
IRRRL lenders.

<div align="center">69.</div>

As set forth below, Relator has provided the Government with actual closing disclosures
prepared by each of the Defendant Lenders that show the Lenders and Title Companies are
charging prohibited closing costs to borrowers and creating false records that were submitted to
the VA.

<div align="center">70.</div>

During Relator's tenure with Service 1st, Service 1st had branch offices located in
Maryland, Florida and North Carolina.  The Maryland and Florida branch offices employ loan
officers and "transfer agents" who make and receive calls in a call center to and from veterans
across the United States.

<div align="center">71.</div>

The Maryland and Florida branches are each comprised of a management team, a loan
origination team, and a loan processing team.  Loan officers are part of the loan origination team,

<div align="right">23</div>

which generates business by contacting veterans, filling out lead sheets, and pitching the sale of the IRRRL to the veteran borrower.  Service 1st sought prospective IRRRL borrowers through multiple marketing channels, including cold calls, direct mailers, purchasing third party leads of eligible IRRRL borrowers, and by reviewing old IRRRL loan packages (including the closing disclosures) previously brokered by Service 1st.

<div align="center">72.</div>

As a loan officer for Service 1st between May 2016 and August 2016, Relator was trained to sell IRRRLs to veterans.  As part of his job duties at Service 1st, Relator was given access to thousands of closing disclosures for IRRRLs previously brokered by Service 1st, which allowed Relator to see and review prior loan terms and identify veterans that could potentially be sold a new IRRRL.  As a result, Relator personally saw closing disclosures for IRRRLs originated by Defendants over many years, predating his employment with Service 1st, and learned that Defendants practice of including fraudulent charges on IRRRL closing disclosures went back many years.

<div align="center">73.</div>

While a loan officer, Relator reported directly to Mr. Aleksandr Vayshelboym, the manager for the Florida branch office in Miami.  As a loan officer, Relator also maintained constant contact with Mr. Brett Cohen, Vice President and Chief Operating Officer for Service 1st, who was located in the office in Miami and with Ms. Christi Bailey, Director of Loan Processing for Service 1st, who was located in the Service 1st office in Glen Burnie, Maryland.

<div align="center">74.</div>

All Service 1st loan officers in Miami, including Relator, attended sales meetings every two weeks in the Service 1st conference room in Miami.  Mr. Vayshelboym, the branch manager,

presided over these sales meetings, which were used to train loan officers (including Relator) and other employees on the sales initiatives and strategies promoted by Service 1st for identifying eligible veterans and selling IRRRLs to them. During these meetings, Mr. Vayshelboym instructed loan officers to exclusively push veteran borrowers into IRRRLs as opposed to "cash out" refinances or purchase mortgage loans.  IRRRLs were favored because these loans produced more money for Service 1st and the other types of VA loans involved more scrutiny from the VA.

75.

Specifically, Mr. Vayshelboym, acting on behalf of Service 1st, instructed loan officers/originators to target disabled veterans, minority veterans, and financially unstable veterans because they were perceived to be financially desperate and would not understand or care about high closing costs or  analyze loan documentation.  These targeted borrowers would not routinely have the resources to research the loan terms or the training to discern the illegal closing costs.  To reach targeted borrowers, Service 1st used demographic information sorted by zip code.  Service 1st placed calls to veterans located in zip codes known to include higher populations of disabled, minority, and indigent veterans.  The closing disclosures for IRRRLs previously brokered by Service 1st also provided demographic information, which assisted Service 1st in accurately targeting disabled, minority, and indigent veterans to contact regarding a new IRRRL.

76.

At the regular Service 1st sales meetings, Mr. Vayshelboym repeatedly reminded loan originators that they were in the business of selling loans and not in the business of taking care of veterans.

77.

These sales directives were also reiterated and discussed during Service 1st's weekly

Wednesday "working lunches" with Mr. Vayshelboym and the branch's loan origination team.

Defendant Armour Settlement often paid for these working lunches.

78.

As part of his training as a loan officer with Service 1st, Relator was given a script to use

when talking to prospective veteran borrowers.  The script was deceptive and misled veterans

into thinking the IRRRL Program was newly created by the Government to provide financial

assistance to veterans. The script specifically offered the veteran a small lump sum of cash at

closing as well as the opportunity to skip two mortgage payments which obviously had the allure

of keeping more money in the pocket of the veteran. The script used a 3-to-1 adjustable rate

mortgage with a maximum interest rate of 7.25% as a sales offer.  The veteran was not expected

to recognize that the refinance would ultimately add tens of thousands of dollars to the veteran's

principal mortgage amount.   Defendants perpetrated their fraud knowing their target audience of

disabled, minority, and indigent veterans would likely be financially seduced by the prospect of

cash at closing and two skipped monthly mortgage payments, even if the refinance was not in the

best interest of the veteran borrower and even if the lender imposed improper high closing fees

as a part of the transaction.

79.

Relator raised his concerns about the training script with Mr. Vayshelboym.

Vayshelboym dismissed Relator's concerns, telling him, "half of these f[*]ckers are one step

from a bankruptcy and can barely pay their credit card bills. When a person is that far in debt you

are helping them by giving them access to money.  Forget what they are giving up for it. At the

end of the day, they are signing the papers, they know what they are doing. Your job isn't to be their financial advisor; it's to sell mortgages. Go out and get them." Despite Mr. Vayshelboym's directive, Relator was reluctant to use the script provided by Service 1st but knows firsthand that other Service 1st employees continued using the deceptive script to deceive veterans as required by Mr. Vayshelboym.

80.

Defendant Cole was very much involved in drafting letters and other communications for loan officer use with prospective borrowers that used the unlawful inducement of two skipped mortgage payments and the receipt of cash out of the refinance. Defendant Cole directed Service 1st's participation in the conspiracy to defraud the VA as described herein.

81.

Relator was trained to structure IRRRLs to maximize compensation to Service 1st by working with the lender to charge the borrower unallowable brokerage fees masked as "discount points" on the closing disclosure. These unallowable fees were rolled into the amount of the borrower's IRRRL and paid to Service 1st. Relator learned that Service 1st wanted to be paid 2% of the loan amount as its broker fee. Service 1st did not disclose to the veteran borrower that more money and additional payments would be tacked on to the principal amount of the loan as a result of the illegal cash incentives paid at closing. Although on occasion IRRRLs involved bona fide discount points that did accurately lower the interest rate to the borrower, most of the time the "discount points" were no more than dollars being paid to Service 1st and did not lower the borrower's interest rate.

82.

During his employment with Service 1st as a loan officer, Relator was trained to get the

veteran on the phone, obtain information about the veteran's life, interests, and financial needs. This information would be used to encourage and manipulate the veteran into refinancing with an IRRRL.

83.

Service 1st and Defendant Lenders courted each other for mutual financial gain in producing a high volume of IRRRLs tainted with excessive closing costs. Defendant Lenders rewarded high producing loan officers and account executives with trips to Las Vegas strip clubs, luxury yacht vacations, and other incentivizing gifts. Defendant Lenders provided such incentives to Relator for referring a substantial number of IRRRLs to them.

84.

Relator left Service 1st in August 2016 and was rehired in May 2017 as the Miami office branch manager when Mr. Vayshelboym left to start another mortgage brokerage business called Iconic Mortgage Corporation. Mr. Vayshelboym took most of the Service 1st staff with him to his new business, which was also located in Miami. Defendant Robert Cole, the owner of Service 1st, was involved in Mr. Vayshelboym's new venture, hence the exodus of Defendant Cole's staff to Iconic Mortgage, and Defendant Cole and Mr. Vayshelboym remained in close communication following Mr. Vayshelboym's departure. Defendant Cole forbade his loan officers from poaching Iconic Mortgage personnel or from competing with Iconic Mortgage if they came upon a prospective borrower who was already talking with Iconic about refinancing.

85.

As branch manager between May 2017 and October 2017, Relator reported directly to Defendant Cole. They developed a working relationship that involved regular phone calls to discuss activities and plans for the Miami branch and the company as a whole. On a daily basis,

Defendant Cole discussed with Relator his business strategies regarding loan origination, loan processing, and relationships with title companies and marketing companies. Defendant Cole emphasized to Relator that Service 1st was a "streamline shop" focused on IRRRLs and that closing IRRRLs was Service 1st's number one priority.  IRRRLs are the financial products of choice for lenders and brokers in the cycle of lowering interest rates.

86.

In his role as branch manager, Relator regularly and routinely worked with each Defendant Lender.  Specifically, Relator dealt with Defendant Lenders' account executives, or "AEs" as they are referred to in the industry, when trying to originate and close an IRRRL.  An AE serves as the primary contact between the lender and the broker and works to ensure that the lender is receiving as many IRRRL borrowers as possible from the broker.  The AE's role was the same for each Defendant Lender with whom Relator worked:  to receive as many loan referrals from the broker as possible.  The AEs were, in essence, salesmen who were incentivized and paid based on their loan production.

87.

Once a Service 1st loan officer obtained agreement from a veteran to do an IRRRL, the loan officer would take the deal to a Lender's AE or an account manager who worked for the Lender to see if the Lender would accept the deal. The Lender has the last word on all aspects of the IRRRL as between the Lender and the Broker.

88.

Lenders provided loan officers with incentives to induce more IRRRL referrals. For example, Defendant Freedom Mortgage had a program it called "Select Preferred" that incentivized brokers to sell IRRRLs that included 2 purported discount points.  Defendant

Majestic had a similar incentive program.  If the loan officer could manipulate the borrower into entering into a deal that included 2 purported discount points, then the Lender did not have to pay for the broker's fees; the broker fees would be paid with the dollars associated with the phony discount points paid by the unsuspecting borrower.

<div align="center">89.</div>

When Relator was promoted to branch manager of the Miami office, Defendant Cole instructed Relator to introduce himself to all AEs with whom Service 1st conducted business. Cristi Bailey, the Director of Loan Processing at Service 1st, provided Relator with a list of contact information for AEs, along with their relevant company matrix.

<div align="center">90.</div>

Relator was one of only three branch managers at Service 1st.  In that role, Relator learned that Service 1st employs the same systemic IRRRL brokerage practices in each of its branches and that such practices were utilized with veterans with IRRRL loans across the United States.  Mr. Fred Bose was the Service 1st branch manager in Glen Burnie, Maryland, and Ms. Edyta Gocek Rhodes was the Service 1st branch manager in North Carolina.

<div align="center">91.</div>

On a daily basis, Defendant Lenders provided Service 1st with the current IRRRL interest rate terms that Service 1st as brokers could offer to veterans.  Each weekday, Defendant Lenders' AEs sent "rate sheets" to Relator containing IRRRL interest rates and corresponding real discount points for that day.  Defendant Lenders' rate sheets did not contain closing costs. Relator learned that rate sheets were historically used in the mortgage broker-lender relationship to communicate loan information.  Defendants Freedom Mortgage and Majestic Home Loans also used 'off rate sheet pricing' with Service 1st loan officers, offering certain special pricing for

IRRRLs for that day.

92.

The Defendant Lenders' rate sheets gave Service 1st loan officers the financial tools necessary to broker favorable deals with Defendant Lenders, who would pay Service 1st origination fees in exchange for brokering IRRRLs.  Service 1st trained Relator to pursue 2% broker fees representing 2% of the loan amount and to manipulate the interest rates in order to develop deals looked like a good deal to the unsuspecting veteran borrowers.

93.

Relator learned that Defendant Lenders targeted different types of borrowers.  For example, Defendant Majestic Home Loan offered IRRRLs to any veteran, regardless of his or her credit score (FICO score), who was not delinquent on his current mortgage payments at the time of closing.  Defendant Freedom Mortgage offered IRRRLs at lower interest rates for borrowers with higher FICO scores and at higher interest rates for borrowers with lower FICO scores.  Defendant Freedom ignored the veteran's payment history if the existing mortgage was current at closing even if that was temporary condition for a given borrower.  If Defendant Brokers had a prospective borrower with a FICO score lower than 500 or in some cases between 580 and 500, the IRRRL deal was referred to Defendant Majestic Home Loan rather than to Defendant Freedom Mortgage.

94.

Although brokers, including Relator, do not attend closings or prepare closing disclosures, Lenders send the broker a copy of the closing disclosure before the loan closes and the broker retains a copy of the closing disclosure for at least 3 years.  By examining Service 1st's retained closing disclosures, Relator discovered the scheme of charging grossly inflated and

bogus settlement closing costs had been in pace for years. Defendant Cole confirmed to Relator that this is the way this industry works and always had for years prior to Relator's employment.

95.

In fact, every IRRRL closing disclosure reviewed by Relator that Service 1st originated for Defendant Lenders using Defendant Title Companies included excessively high or phantom fees paid by veteran borrowers that were neither reasonable nor customary.

96.

Defendant Lenders routinely rely on brokers, including Defendant Brokers, to nominate a title company to conduct their IRRRL closings.

97.

When Relator was promoted to branch manager, he learned of the central role Defendant Title Companies play in the conspiracy alleged herein based upon direct conversations with Defendant Cole.  Defendant Cole, the owner of Service 1st, mandated the use of one of three title companies for IRRRL closings: Defendant Armour Settlement, Defendant Certified Title, or Powerhouse Title.  Defendant Cole informed Relator that these three companies would "work out an arrangement with the mailers" in exchange for Service 1st's business referrals to Defendant Title Companies.  Relator saw first-hand the mutually beneficial and remunerative quid pro quo existing between Service 1st and Defendant Title Companies:  Service 1st referred IRRRLs to Defendant Title Companies, who benefitted financially by charging veteran borrowers excessive fees, and Defendant Title Companies provided free marketing materials, such as direct promotional mailers, to Service 1st, who benefitted financially from increased exposure to veterans as the place to call to refinance a mortgage.

98.

Defendant Cole told Relator that Defendant Title Companies overcharge for title work to pay for free marketing for the broker who selects the title company, which is a "win-win" situation because each of the conspirators gets paid well.

99.

During his tenure as a loan officer, Relator discussed with Defendant Cole his concern regarding excessive title charges being assessed to veteran borrowers in IRRRL transactions. Relator informed Defendant Cole that he could not remain a loan officer if he had to push loans stacked with inflated title fees and other charges that exceed reasonable and customary rates.  In response, Defendant Cole counseled Relator that "looking the other way" on exorbitant title charges is in the best interest of Service 1st because the overages make their way back to Service 1st in the form of marketing services paid by the title companies.  Specifically, Defendant Cole told Relator that two of the title companies used by Service 1st, Defendant Armour Settlement and Defendant Certified Title, use a portion of the fraudulently inflated title charges from IRRRL closings to hire marketing firms, such as Monster Lead Group, Titan List and Gemco Graphic Services to generate leads that identify veterans which are passed on to Service 1st to contact. Defendant Title Companies also provided Service 1st with free advertising and veteran call lists containing contact information for veterans with existing VA loans.

100.

Defendant Cole offered to set up a meeting for Relator with Stephen Millstein, the owner of Defendant Certified Title. Referring to Mr. Millstein, Defendant Cole told Relator: "He could pay for your mailers and you guys will do more loans."  Defendant Cole also told Relator that "charging sky-high fees with Armour and getting mail is a perk of being in the business. No one

really gives a sh[*]t about title fees.  Lenders, title companies, and loan officers care about one

thing – doing loans."  One day between May 2016 and August 2016, in Defendant Cole's office

in Maryland, Defendant Cole told Relator that "no one was going to stop the gravy train to

complain about a few hundred dollars of misplaced title fees."

<center>101.</center>

Relator subsequently had conversations with Mr. Milstein and Naftali Raphaely, one of

the owners of Defendant Armour Settlement in which both of these individuals stressed to

Relator that the key to success in the Government mortgage lending business is to build a close

relationship with a title company that is willing to "play ball."

<center>102.</center>

On August 2, 2017, while Relator was the branch manager in Miami, Mr. Millstein called

Relator to ask what he was doing with regard to marketing services. Relator's branch was

sending roughly $50,000/month in revenue to Millstein's [Defendant] Certified Title.   Relator

informed Mr. Millstein that he had trained his team to be 100% outbound; in other words,

Relator's team was marketing loans by calling previous customers who had previously purchased

an IRRRL brokered by Service 1st. Mr. Millstein offered to assist Relator by "lending a hand"

and providing direct mail marketing for him.

<center>103.</center>

To develop leads on potential IRRRL borrowers, Relator asked for and received from

Service 1st's Christi Bailey, a report showing prior IRRRLs brokered by Service 1st; the

borrowers' names; the amounts of their loans; the interest rates and the property addresses. After

leaving Service 1st in October 2017, Relator investigated and ascertained that fully 106 of those

prior IRRRLs had gone beyond default and into foreclosure proceedings.

104.

As a result of Relator's acquaintance with Mr. Raphaely, one of the owners of Defendant
Armour Settlement, and his post-closing review of IRRRL disclosures containing charges for
Defendant Armour Settlement's services, Relator learned that Defendant Armour Settlement
inflated settlement costs and fraudulently charged veteran borrowers for bogus taxes that were
not due.  In addition, Relator has knowledge that Defendant Armour personnel Matthew Bereger
and Alison Ponce (closing coordinator) arranged bribes to notaries via "snap docs" for changing
loan settlement dates.

105.

In October 2017, Relator voiced his concerns regarding the excessive settlement fees
being charged to veteran borrowers in IRRRL transactions to Brett Cohen, Vice President of
Service 1st in Miami.  In response, Relator was told to "fall in line" and do what he was hired to
do.  Relator was fired days later.

106.

On information and belief, Service 1st is one of many brokers who sell IRRRLs to
veterans which contain illegal fees and conspires with Defendant Lenders (and other IRRRL
lenders) and Defendant Title Companies (and other title companies); however, Relator does not
have additional documentation regarding such wrongdoing as of the date of the filing this
Complaint.  Relator has been told that the illegal practices described herein are widespread
throughout the industry and that the tactics and actions of Defendants are mirrored by other
IRRRL brokers, lenders, and title companies across the United States.

<u>Unlawful Cash Out of IRRRL Closings</u>

107.

As described herein, one tactic used by Defendants to lure veterans into refinancing under the IRRRL Program was to offer a cash incentive.  Defendants, knowing the IRRRL Program regulations promulgated by the VA specifically prohibit the payment of cash proceeds to veteran borrowers at closing, continued to structure IRRRLs to give veteran borrowers cash as part of the refinance closing.  Exhibit 6 hereto is one of many examples of an IRRRL in which a Defendant Lender and Broker unlawfully structured the closing to pay cash to the borrower.  Defendant Lenders falsely certified to the VA that the lenders would comply with Title 38 of the U.S. Code and the applicable VA regulations that prohibit giving the borrower cash from IRRRL proceeds. Those certifications were false.

108.

As explained by the VA, "[t]here are two types of [VA] guaranteed loans: purchase and refinance. A purchase loan is used to obtain a home. The other loan type is a refinance, and there are two kinds of refinance loans: interest rate reduction and other refinance (i.e., cash-out refinancing). Interest rate reduction is typically the most common reason for refinancing a loan." *See* VA Loan Guaranty Program Report for 2017, p. 3 (https://www.benefits.va.gov/REPORTS/abr/ABR-LoanGuaranty-FY16-02062017.pdf).  The IRRRL Program prohibits lenders from offering cash back or skipped loan payments as an inducement to veterans in an IRRRL transaction.  *See* Lenders Handbook – VA Pamphlet 26-7, Ch. 6, 6-4(f) ("An IRRRL cannot be used to take equity out of the property or pay off debts . . . therefore, the general rule is that the borrower cannot receive cash proceeds from the loan.  If necessary, the refinancing loan amount must be rounded down to avoid payments of cash to the

veteran."); *see also* 38 U.S.C. § 3710 (stating that "no loan may be guaranteed under this section unless the proceeds of such loan will be used to pay for the property purchased").  By law, the VA cannot guarantee loans made for ineligible loan purposes.  *See* Lenders Handbook – VA Pamphlet 26-7, Ch. 3, 3-6(b).  Cash proceeds given to veterans as part of an IRRRL refinance are considered an ineligible loan purpose and, therefore, ineligible for the VA guaranty.  *Id.*

109.

"Cash out" refinance loans, in direct contrast to IRRRLs, allow veterans to receive cash, but eligibility is based on the veteran's credit worthiness and application of specific underwriting standards at the time of the loan closing.  Eligibility for IRRRLs is not based on the veteran's creditworthiness.  *See* 38 C.F.R. § 36.4340(a).  This case does not relate to "cash out" refinance loans.

## VI. <u>DEFENDANT LENDERS' FALSE CERTIFICATIONS TO THE GOVERNMENT</u>

110.

Each Defendant Lender has made and continues to make false certifications to the VA to obtain the VA's guaranty on IRRRLs which Defendant Lenders originate and close.

<u>(The Application to Close IRRRLs on an Automatic Non-supervised Basis, VA Form 26-8736)</u>

111.

Prior to closing any IRRRLs, Defendant Lenders applied and received authorization from the VA to originate and close IRRRLs on an "automatic non-supervised" basis.  *See* 38 U.S.C. § 3702(d); 38 C.F.R. § 36.4352; VA Form 26-8736; VA Pamphlet 26-7; 38 C.F.R. § 36.4301 ("Automatic lender [is a] lender that may process a loan or assumption without submitting the credit package to the Department of Veterans Affairs for underwriting review. Pursuant to 38 U.S.C. [§] 3702(d) there are two categories of lenders who may process loans automatically . . .

(2) Lenders approved by the Department of Veterans Affairs pursuant to standards established by the Department of Veterans Affairs.").  The VA strongly encourages automatic, non-supervised IRRRL closings and the program is dependent on the integrity and honesty of the participating lender companies.

112.

The application lenders must submit for approval as an "automatic lender" is VA Form 26-8736, which required Defendant Lenders to explicitly certify the following: "If this application is approved, the undersigned agrees and certifies that (1) it will comply with the provisions of title 38 USC, VA regulations and other directives issued by VA."  VA Form 26-8736 is pictured below in relevant part:



**CERTIFICATIONS**

If this application is approved, the undersigned agrees and certifies that:

(1) It will comply with the provisions of title 38 USC, VA regulations and other directives issued by VA;

Application for Authority to Close Loans on an Automatic Basis-Nonsupervised Lenders, VA Form 26-8736, attached hereto as Exhibit 1 (emphasis added).

113.

When Defendant Lenders submitted the certification in VA Form 26-8736, each of them knew they had not been and were not complying with 38 U.S.C. § 3703 or with the VA's Limited Charges Rule (38 C.F.R. § 26.4313), or with the VA's prohibition against cash proceeds to veterans at IRRRL closings.  Thus, each Defendant Lender repeatedly and falsely certified compliance with the central and most material facets of the IRRRL Program on VA Form 26-8736.

(Report and Certification of Loan Disbursement, VA Forms 26-1820 and 1820(a))

114.

To obtain the VA's guaranty, within 60 days of closing an IRRRL, each Defendant

Lender is required to expressly certify on VA Form 26-1820 that it "has not imposed and will not

impose any charges or fees against the borrower in excess of those permissible under the

schedule set forth in paragraph (d) of 38 C.F.R. [§] 36.4312 [*sic*] [the Limited Charges Rule]."[4]

VA Form 26-1820 is pictured below in relevant part:

| SECTION II - LENDER'S CERTIFICATION |
| --- |
| 24. I, THE UNDERSIGNED LENDER, CERTIFY THAT: |
| A.  If this loan was closed under the automatic procedure, no default exists which has continued for more than 30 days. |
| B.  The lender has not imposed and will not impose any charges or fees against the veteran borrower in excess of those permissible under the schedule set forth in paragraph (d) of 38 CFR 36.4312. |

Report and Certification of Loan Disbursement, VA Form 26-1820, attached hereto as Exhibit 2

(emphasis added); *see also* 38 C.F.R. § 36.4303 (reporting requirements for automatic guaranty).

115.

Each time a Defendant Lender charges fees to IRRRL borrowers that are prohibited by

the Limited Charges Rule and then submits VA Form 26-1820 to the VA to obtain the guaranty,

it is submitting a false certification to the VA.

116.

VA Form 26-1820 also requires each lender to certify that the information provided to the

VA regarding the loan is true, accurate, and complete.  *See id.* (Certification C in Exhibit 2).

Defendant Lenders have and continue to charge false fees on closing disclosures (including but

not limited to broker fees disguised as "discount points") that they submit to the VA.  Thus,

---

[4] The Form references "38 C.F.R. 36.4312."  The text of 38 C.F.R. § 36.4312 was renumbered,
otherwise unchanged, to 38 C.F.R. § 36.4313, effective October 22, 2010, as part of a
reorganization for consistency in internal cross references between §§ 4300 and 4800.  *See* 75 FR
65238, Oct. 22, 2010.

Defendant Lenders each submit a false certification to the VA each time they execute

Certification C and submit Form 26-1820 to the VA after closing an IRRRL.

117.

Moreover, VA Form 26-1820 explicitly warns lenders of the steep consequences

triggered by false or fraudulent certifications:

> Federal Statutes provide severe penalties for any fraud, intentional
> misrepresentation, or Criminal Connivance or conspiracy purposed to influence
> the issuance of any guaranty or insurance by the Department of Veterans Affairs.

*Id.*

<u>(HUD/VA Addendum to Uniform Residential Loan Application, VA Form 26-1802a)</u>

118.

In order to "induce the [VA] to issue a certificate of commitment to guarantee" an

IRRRL, each Defendant Lender is required to expressly certify the following on VA Form 26-

1802a:

> The loan terms furnished in the final Uniform Residential Loan Application and
> this Addendum are true, accurate and complete.

> \* \* \* \*

> The proposed loan conforms otherwise with the applicable provisions of Title 38,
> U.S. Code, and the regulations concerning guaranty or insurance of loans to
> veterans.

VA Form 26-1802a, Part II, "Lender/Mortgagee Certification," is attached hereto as Exhibit 3

and is pictured below in relevant part:

**HUD Instructions:** The capitalized terms used in this form refer to those terms as used in the relevant sections of the current version of Single Family Housing Policy Handbook, HUD 4000.1.

**Part II – Lender/Mortgagee Certification**

21. The undersigned lender/mortgagee makes the following certifications to induce the Department of Veterans Affairs to issue a certificate of commitment to guarantee the subject loan or a Loan Guaranty Certificate under Title 38, U.S. Code, or to induce the Department of Housing and Urban Development - Federal Housing Commissioner to issue a firm commitment for mortgage insurance or a Mortgage Insurance Certificate under the National Housing Act.

A. The loan terms furnished in the final Uniform Residential Loan Application and this Addendum are true, accurate and complete.

B. (1) The information contained in the initial Uniform Residential Loan Application and this Addendum was obtained from the Borrower by an employee of the undersigned lender/mortgagee or its duly authorized agent and to the best of lender/mortgagee's knowledge is complete and accurately represents the information obtained by the lender/mortgagee as of the date the Borrower provided the information to the undersigned lender/mortgagee or its duly authorized agent.

(2) The information contained in the final Uniform Residential Loan Application, which was signed by the Borrower at the time of settlement, was obtained by an employee of the undersigned lender/mortgagee or its duly authorized agent and to the best of lender/mortgagee's knowledge is complete and accurately represents the information obtained by the lender/mortgagee as of the date verified by the lender/mortgagee.

C. The credit report submitted on the subject Borrower (and Co-Borrower, if any) was ordered by the undersigned lender/mortgagee or its duly authorized agent from the credit agency which prepared the report and was received directly from said credit agency.

D. The Verifications of Employment, Deposit, Rent and Mortgage, as applicable, were requested and received by the lender/mortgagee or its duly authorized agent without passing through the hands of the Borrower or any Interested Third Party and are to the best of lender/mortgagee's knowledge accurate.

E. To the best of my knowledge, neither I nor any other Participant (as that term is clarified in HUD Handbook 400 0.1, II.A.1.b.ii.(B)) in this Covered Transaction (as that term is clarified at 2 C.F.R. § 180.200) is suspended, debarred, under a limited denial of participation, or otherwise restricted under 2 C.F.R. part 2424 or 24 C.F.R. part 25, or under similar procedures of any other federal agency.

**Items "F" through "H" are to be completed as applicable for VA loans only.**

F. The names and functions of any duly authorized agents who developed on behalf of the lender/mortgagee any of the information or supporting credit data submitted are as follows:

| Name & Address | Function (e.g., obtained information on the Uniform Residential Loan Application, ordered credit report, verifications of employment, deposits, etc.) |
|---|---|
| | |

If no agent is shown above, the undersigned lender/mortgagee affirmatively certifies that all information and supporting credit data were obtained directly by the lender/mortgagee.

G. The undersigned lender/mortgagee understands and agrees that it is responsible for the omissions, errors, or acts of agents identified in item F as to the functions with which they are identified.

H. The proposed loan conforms otherwise with the applicable provisions of Title 38, U.S. Code, and of the regulations concerning guaranty or insurance of loans to veterans.

HUD/VA Addendum to Uniform Residential Loan Application, VA Form 26-1802a, Exhibit 3 (emphasis added).

119.

When Defendant Lenders submit Form 26-1802a to the VA they are submitting a false certification to the VA because they know the loan terms set forth on the closing disclosures that include inflated and bogus charges are not true, accurate and complete information. When a Defendant Lender charges purported discount points to an IRRRL borrower that are merely disguised broker fees, the loan terms are not true, accurate and complete. Lenders also know that when they charge fees not permitted by the Limited Charges Rule, the proposed loan does not

conform to the applicable and express regulations concerning guaranty of IRRRLs to veterans. Thus, Defendant Lenders submit a false certification to the VA each time they execute and submit Form 26-1802a to the VA after closing an IRRRL at issue in this case.

120.

Since February 2017, VA Form 1802a also includes an explicit warning to lenders about the steep consequences triggered by false or fraudulent certifications:

> WARNING:  This warning applies to all certifications made in this document. The knowing submission of false, fictitious, or fraudulent certifications may be subject to criminal and civil penalties, including confinement for up to 5 years, fines, and civil penalties.  18 U.S.C. §§ 287, 1001 and 31 U.S.C. § 3729 [the False Claims Act].

*Id.*

121.

The materiality of compliance with Title 38 of the U.S. Code and the Limited Charges Rule could not be any clearer.  The VA could not have lawfully issued a guaranty on any IRRRL known to contain unallowable and/or inflated charges.  *See* 38 C.F.R. § 36.4313.  Thus, Defendant Lenders' false certifications, regarding their compliance with the applicable provisions of Title 38 of the U.S. Code and the VA's regulations concerning IRRRLs, were material to the VA's decision to guaranty each and every IRRRL.

122.

In summary, Defendant Lenders lie and make false express certifications to the VA before, during, and after they close the IRRRLs tainted by their fraud.

### VII.    EXAMPLES OF PROHIBITED FEES CHARGED BY DEFENDANT LENDERS

123.

(Veteran P's IRRRL)

Attached as Exhibit 5 is a true and correct copy of a closing disclosure created by

Defendant Lender Majestic that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement.  The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes.  This closing disclosure is for an IRRRL that closed on July 25, 2016.  The collateral for this IRRRL is Borrower P's home in Atlanta, Georgia.  *See* Exhibit 5 at p. 1.

124.

As evidenced by the closing disclosure, Defendants Majestic, Service 1st, and Armour Settlement have charged Veteran P more than the 1% Flat Charge, as well as Enumerated Fees that exceed reasonable and customary rates.  *See id*. at p. 2

125.

Veteran P's IRRRL totals $220,847.00; thus, the 1% Flat Charge would amount to $2,208.47.  *See* Exhibit 5 at p. 1.

126.

The total closing costs charged by Defendants to Veteran P (not including charges for purported "discount points" totaling $3,036.65) amount to $3,037.25, broken down as follows:

| | |
|---|---|
| Underwriting fee | $595.00 |
| Title Abstract | $395.00 |
| Attorneys' Fee | $325.00 |
| Title Binder | $395.00 |
| Title Exam | $745.00 |
| Lender Title Insurance Fee | $542.25 |
| Title Single Trans | $40.00 |
| Total | $3,037.25 |

Exhibit 5 at p. 2.

127.

The closing costs exceed $2,208.47, the 1% Flat Charge; thus, any additional fees must

be limited to reasonable and customary" Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

128.

Defendant Majestic charged Veteran P closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates.  In some instances, Majestic charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Majestic charged Enumerated Fees that it did not incur or that Majestic marked up excessively beyond reasonable and customary rates.

129.

One unallowable fee charged by Defendant Majestic to Veteran P is $325.00 in attorneys' fees.  *See* Exhibit 5 at p. 2, Block C, line 02; *see* 38 C.F.R. § 36.4313(d)(1).  Attorneys' fees are not Enumerated Fees and are thus not chargeable to the borrower outside of the 1% Flat Charge. *See* Lenders Handbook – VA Pamphlet 26-7, Ch. 8, Section 3 (entitled "Fees and Charges the Veteran Borrower Cannot Pay":  "The Lender may not charge the borrower for attorneys' fees.")

130.

Georgia law requires an attorney to close real estate mortgage loans.  *See* Georgia Supreme Court, Formal Advisory Op. No. 86-5 (May 12, 1989) (citing O.C.G.A. § 15-19-50). The attorney listed as the closing agent on Veteran P's IRRRL closing disclosure is William E. Fair.  Defendant Armour Settlement is listed as the "settlement agent."  *See* Exhibit 5 at p. 5.

131.

In addition to the unallowable attorneys' fees charge, Defendant Majestic charged Veteran P for both a title abstract ($395.00) as well as a title exam ($745.00).  *See* Exhibit 5 at p.

2.  A title abstract is the same thing as a title exam:  one or the other of these fees was not in fact

incurred and therefore is not reasonable and customary.

132.

Moreover, the title examination fee of $745.00 is far above the reasonable and customary

charge for a title exam in Georgia, particularly in a refinance transaction where there is no

transfer of title to the property.

133.

Defendant Majestic marked up the "recording fee" it charged to Veteran P almost 100%

over the actual recording fee paid to Fulton County, Georgia.  Fulton County, Georgia, where

Veteran P's refinanced home was located, charged a recording fee of $10.00 for the first page

and $2.00 for each subsequent page.  The security deed for Veteran P's refinanced home with its

attachments totaled 25 pages as seen in the Fulton County, Georgia Deed Book. The first page

was $10.00 and the next 24 pages were $48.00, for a total of $58.00.  Defendant Majestic falsely

inflated the $58.00 recording fee on the closing disclosure to fully $120.00.   *See* Exhibit 5 at p.

2.

134.

Defendant Majestic charged Veteran P $395.00 for a "Title –Binder."  *See* Exhibit 5 at p.

2.  That is far in excess of the reasonable and customary amount for a title binder in Georgia.   A

title binder is the act of the closing agent obtaining a commitment for title insurance from the

title insurance company based on the results of a title examination.  A title binder is customarily

free of charge or no more than $50.00.

135.

To obtain the VA's guaranty of Veteran P's IRRRL, Defendant Majestic fraudulently

certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (See Section VI, *supra*.)

136.

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran P's IRRRL loan closing package, Defendant Majestic knew it was not complying with the Limited Charges Rule and that Veteran P's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

137.

To close Veteran P's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S.C., VA regulations and other directives issued by VA.  When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

138.

Relator uses Veteran P's IRRRL as an example of the many IRRRLs Defendant Majestic has fraudulently originated and closed in Georgia.  When these IRRRLs go into default, the VA incurs damages.

139.

Defendants Majestic, Service 1st and Amour Settlement have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

140.

The closing disclosure with the false $120.00 recording fee and the duplicative false charges for both a title abstract and a title exam for Veteran P's IRRRL, Exhibit 5 hereto, is a false record created by Defendant Majestic, which Majestic knowingly submitted to the VA to secure the VA's guaranty of Veteran P's IRRRL.

141.

Defendant Majestic has violated the FCA by making and using a false record to get the VA guaranty.

142.

Defendants Majestic Home Loan, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 5.

143.

(Disabled Veteran V's IRRRL)

Attached as Exhibit 6 is a true and correct copy of a redacted IRRRL closing disclosure created by Defendant Majestic Home Loan for Disabled Veteran V, which IRRRL was brokered by Defendant Service 1st and closed by Defendant Armour Settlement on July 27, 2016.  The collateral for the IRRRL is Disabled Veteran V's home located in Arnold, Maryland.  *See* Exhibit 6, p.1.

144.

As clearly evidenced by the closing disclosure, Defendants Majestic charged Disabled Veteran V more than the allowable 1% Flat Charge, as well as Enumerated Fees that exceed reasonable and customary rates.  *See* Exhibit 6, p. 2.

145.

Disabled Veteran V's IRRRL was for $163,000.00; thus, the 1% Flat Charge would amount to $1,630.00.  Id.  The total closing costs charged by Defendants to Disabled Veteran V (not including charges for purported "discount points" in the amount $3,260.00) amount to $3,051.96, broken down as follows:

| | |
|---|---|
| Underwriting fee | $595.00 |
| Title Abstract | $395.00 |
| Title Binder | $495.00 |
| Title Exam | $870.00 |
| Lender Title Insurance Fee | $476.96 |
| Credit Report Fee | $25.88 |
| Recording Fees | $110.00 |
| Transfer Taxes | $85.00 |
| Total | $3,051.96 |

Exhibit 6, p.2.

146.

The closing costs of $3,051.96 exceed 1% of the loan amount (the allowable 1% Flat Charge), so any additional fees must be limited to reasonable and customary" Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

147.

Defendant Majestic Home Loan charged Disabled Veteran V duplicative fees and Enumerated Fees in excess of reasonable and customary rates.

148.

Defendant Majestic charged Disabled Veteran V for both a title abstract ($395.00) and a title exam ($870.00).  *See* Exhibit 6 at p. 2.   A title abstract is the same thing as a title exam: one or the other of these fees was not in fact incurred and therefore is not reasonable and

customary.

149.

Moreover, the title examination fee of $870.00 is far above the reasonable and customary charge for a title exam in Maryland, particularly in a refinance transaction.

150.

Defendant Majestic also falsely inflated the "Taxes and Other Government Fees" charged to Disabled Veteran V as reflected on his closing disclosure.  Anne Arundel County, Maryland, where Disabled Veteran V's refinanced home was located, charged a recording fee of $60.00 and did not charge transfer taxes, which are not collected in Maryland on refinance transactions. Instead of a transfer tax, Anne Arundel County, Maryland charges a "recordation tax" of $70.00. Thus, the "Taxes and Other Government Fees" charged should have totaled $130.00, but Defendants Majestic and Armour charged Disabled Veteran V a recording fee of $110.00 and transfer taxes of $85.00, totaling charges of $195.00 for "Taxes and Other Government Fees," which were not reasonable and customary.  *See* Exhibit 6 at p. 2, Block E, lines 1-2.

151.

Defendants Majestic and Armour grossly inflated the "title binder" fee charged to Disabled Veteran V.  A title binder is merely a commitment for title insurance based on the results of a title examination and, according to the owner of Ardent Title Company in Elkton, Maryland, who has over 28 years of title experience, is customarily no more than $50.00. Defendants unlawfully charged Disabled Veteran V a title binder fee of fully $495.00, which was not reasonable and customary.  *See* Exhibit 6 at p. 2.

152.

To obtain the VA's guaranty of Disabled Veteran V's IRRRL, Defendant Majestic

fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule and that the IRRRL and that conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

<div align="center">153.</div>

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Disabled Veteran V's IRRRL loan closing package, Defendant Majestic knew it was not complying with the Limited Charges Rule and that Disabled Veteran V's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

<div align="center">154.</div>

To close Disabled Veteran V's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA. When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

<div align="center">155.</div>

Relator uses Disabled Veteran V's IRRRL as an example of the many IRRRLs Defendant Majestic has fraudulently originated and closed in Maryland.  When any of these fraudulent IRRRLs go into default, the VA will incur damages.

<div align="center">156.</div>

Defendants Majestic, Service 1st, and Amour Settlement have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently induced and closed IRRRLs.

157.

Given the false $195.00 for "Taxes and Other Government Fees" and the duplicative false charges for both a title abstract and a title exam on the closing disclosure for Disabled Veteran V's IRRRL, that closing disclosure, Exhibit 6 hereto, is a false record created by Defendant Majestic, which Majestic knowingly submitted to the VA to secure the VA's guaranty of Disabled Veteran V's IRRRL.

158.

Defendant Majestic has violated the FCA by making and using the false record that is Exhibit 6.

159.

Defendants Majestic Home Loan, Service 1st, and Armour Settlement have violated the FCA by conspiring to use the false record contained in Exhibit 6.

160.

(Veteran F's IRRRL)

Attached as Exhibit 7 is a true and correct copy of a closing disclosure created by Defendant Majestic that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement. The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes. This closing disclosure is for an IRRRL that closed on July 25, 2016. The collateral for this IRRRL is Borrower F's home in Raeford, North Carolina. *See* Exhibit 7 at p. 2.

161.

As evidenced in the closing disclosure, Defendants Majestic Home Loan, Service 1st, and Armour Settlement charged Veteran F more than the 1% Flat Charge, as well as Enumerated

Fees in excess of reasonable and customary rates.  *See* Exhibit 7 at p. 3.

162.

Veteran F's IRRRL totals $198,310.00; thus, the 1% Flat Charge would amount to

$1,983.10 *See* Exhibit 7 at p. 1.

163.

The total closing costs charged by Defendants to Veteran F (not including charges for

purported "discount points" totaling $2,726.76) amount to $3,201.97, broken down as follows:

| | |
|---|---|
| Loan Origination | $595.00 |
| Attorneys' Fee | $285.00 |
| Binder Fee | $395.00 |
| Lenders Title Insurance Fee | $505.97 |
| Title Procurement Fee | $495.00 |
| Title Service | $810.00 |
| Recording Fees | $116.00 |
| | |
| Total | $3,201.97 |

Exhibit 7 at p.2.

164.

The closing costs exceed $1,983.10, the 1% Flat Charge; thus, any additional fees must

be limited to reasonable and customary "Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see*

*also* 38 U.S.C. § 3703(c)(1).

165.

Defendant Majestic charged Veteran F closing costs above the 1% Flat Charge that are

unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed

reasonable and customary rates. In some instances, Majestic charged Enumerated Fees that are

not reasonable and customary because they are duplicative of one another; in other instances,

Majestic charged Enumerated Fees that it did not in fact incur or that Majestic marked up beyond

reasonable and customary rates.

<center>166.</center>

One unallowable fee charged by Defendant Majestic to Veteran F is $285.00 in attorneys' fees. *See* Exhibit 7 at p. 2, Block C, Line 03.  Attorneys' fees are not Enumerated Fees and thus are not chargeable to the borrower outside of the 1% Flat Charge. *See also* Lenders Handbook – VA Pamphlet 26-7, Ch. 8, Section 3 (entitled "Fees and Charges the Veteran Borrower Cannot Pay":  "The Lender may not charge the borrower for attorney's fees.").

<center>167.</center>

Another unallowable fee charged by Defendant Majestic to Veteran F is $595.00 for "Loan Origination Fee." An origination charge is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge.  Borrowers are specifically prohibited from paying broker origination fees.  *See* 38 C.F.R. § 36.4313(c).

<center>168.</center>

In addition to the unallowable attorneys' fees and unallowable loan origination fee, Defendant Majestic marked up the "recording fee" it charged to Veteran F almost 100% over the actual recording fee paid to Hoke County, North Carolina. Hoke County, North Carolina, where Veteran F's refinanced home was located, charged a recording fee of $68.00.  Defendant Majestic falsely inflated the $68.00 recording fee on the closing disclosure to $116.00. *See* Exhibit 7 at p. 3, Block E, Line 01.

<center>169.</center>

Defendant Majestic charged Veteran F $395 for a "Title – Binder."  *See* Exhibit 7 at p. 3, Block C, Line 04. That is in excess of the reasonable and customary amount for a title binder in North Carolina.  A title binder is merely a commitment for title insurance based on the results of

a title examination and is customarily free of charge, but no more than $50.00, at most North Carolina law firms.

<div align="center">170.</div>

Defendants Majestic and Armour Settlement charged Veteran F for both "title procurement" ($495.00) and "title service" ($810.00).  "Title procurement" and "title service" are the same thing:  one or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

<div align="center">171.</div>

To obtain the VA's guaranty of Veteran F's IRRRL, Defendant Majestic fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

<div align="center">172.</div>

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran P's IRRRL loan closing package, Defendant Majestic knew it was it not complying with the Limited Charges Rule and that Veteran F's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

<div align="center">173.</div>

To close Veteran F's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA.  When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the

Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

174.

Relator uses Veteran F's IRRRL as an example of the many IRRRLs Defendant Majestic has fraudulently originated and closed in North Carolina.  When any of such IRRRLs go into default, the VA will incur damages in amounts to be determined at trial.

175.

Defendants Majestic, Service 1st, and Amour Settlement have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

176.

Given the false $116.00 recording fee and the duplicative false charges for both title procurement and title service on the closing disclosure for Veteran F's IRRRL, that closing disclosure, Exhibit 7 hereto, is a false record created by Defendant Majestic, which Majestic knowingly submitted to the VA to secure the VA's guaranty of Veteran F's IRRRL.

177.

Defendant Majestic has violated the FCA by making and using the false record that is the closing disclosure, Exhibit 7.

178.

Defendants Majestic, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 7.

179.

(Veteran S' IRRRL)

Attached as Exhibit 8 is a true and correct copy of a closing disclosure created by

Defendant Lender Majestic that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement.  The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes. This closing disclosure is for an IRRRL that closed on July 25, 2016.  The collateral for this IRRRL is Veteran S' home in Tuscaloosa, Alabama.  *See* Exhibit 8 at p. 1.

<div align="center">180.</div>

As evidenced by the closing disclosure, Defendants Majestic, Service 1st, and Armour Settlement have charged Veteran S more than the 1% Flat Charge, as well as Enumerated Fees that exceed reasonable and customary rates.  *See* Exhibit 8.

<div align="center">181.</div>

Veteran S' IRRRL totals $159,896.00; thus the 1% Flat Charge would amount to $1,598.96. *See* Exhibit 8 at p. 1.

<div align="center">182.</div>

The total closing costs charged by Defendants to Veteran S (not including charges for purported "discount points" totaling $3,197.92) amount to $3,579.85, broken down as follows:

| | |
|---|---|
| Underwriting Fee | $595.00 |
| Title Coordination Fee | $895.00 |
| Title Examination Fee | $895.00 |
| Lenders Title Insurance Fee | $600.00 |
| Title Search | $150.00 |
| Recording Fees | $205.00 |
| Transfer Taxes | $239.85 |
| Total | $3,579.85 |

Exhibit 8 at p. 2.

<div align="center">183.</div>

The closing costs exceed $1,598.96, the 1% Flat Charge; thus, any additional fees must

be limited to reasonable and customary "Enumerated Fees."  *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

<div align="center">184.</div>

Defendant Majestic charged Veteran S closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates.  In some instances, Majestic charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Majestic charged Enumerated Fees that it did not in fact incur or that Majestic marked up beyond reasonable and customary rates.

<div align="center">185.</div>

Defendant Majestic charged Veteran S an unallowable $595.00 "Underwriting Fee."  *See* Exhibit 8 at p. 2, Block A, line 03.  An underwriting fee is an origination fee, not an Enumerated Fee, and is thus not chargeable to the borrower outside of the 1% Flat Charge.  Lenders are specifically prohibited from charging veterans for broker origination fees.  *See* 38 C.F.R. § 36.4313(c).

<div align="center">186.</div>

Defendant Majestic charged Veteran S $895.00 for a "Title Coordination Fee," $895.00 for a "title examination fee," and $150.00 for a "title search."  A title coordination fee is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge.

<div align="center">187.</div>

A title examination is the same thing as a title search: one or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

188.

Moreover, a title examination fee of $895.00 is well above the reasonable and customary amount for a title exam in Alabama, particularly in a refinance transaction.

189.

Defendant Majestic charged Veteran S fully $600.00 for a "Lender Title Insurance Fee." That is in excess of the reasonable and customary amount for title insurance in Alabama on a $159,895.00 refinanced loan.

190.

Defendant Majestic marked up the "recording fee" it charged to Veteran S over 100% of the actual recording fee paid to Tuscaloosa County, Alabama. Tuscaloosa County, Alabama, where Veteran S' refinanced home was located, charged a recording fee of only $69.00. Defendant Majestic falsely shows the recording fee on the closing disclosure as $205.00. *See* Exhibit 8 at p. 2, Block E, line 01.

191.

To obtain the VA's guaranty of Veteran S' IRRRL, Defendant Majestic fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

192.

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran S' IRRRL loan closing package, Defendant Majestic knew it was not complying with the Limited Charges Rule and that Veteran S' IRRRL did not conform to

applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

193.

To close Veteran S' IRRRL on an automatic basis, which it did, Defendant Majestic

falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title

38 of the U.S. Code, VA regulations and other directives issued by VA.  When it submitted Form

26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the

Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

194.

Relator uses Veteran S' IRRRL as an example of the many IRRRLs Defendant Majestic

has fraudulently originated and closed in Alabama.  When any of such IRRRLs go into default,

the VA will incur damages in amounts to be determined at trial.

195.

Defendants Majestic, Service 1st, and Amour Settlement have violated the FCA by

conspiring to cause false claims to be submitted to the VA following default on their fraudulently

closed IRRRLs.

196.

Given the false $205.00 recording fee and the duplicative false charges for both a title

search and a title examination on the closing disclosure for Veteran S' IRRRL, that closing

disclosure, Exhibit 8 hereto, is a false record created by Defendant Majestic, which Majestic

knowingly submitted to the VA to secure the VA's guaranty of Veteran S' IRRRL.

197.

Defendant Majestic has violated the FCA by making and using the false record that is the

closing disclosure.  *See* Exhibit 8.

198.

Defendants Majestic, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 8.

199.

(Veteran J's IRRRL)

Attached as Exhibit 9 is a true and correct copy of a closing disclosure created by Defendant Lender Majestic that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement.  The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes.  This closing disclosure is for an IRRRL that closed on July 25, 2016.  The collateral for this IRRRL is Borrower J's home in Callahan Florida.  *See* Exhibit 9 at p. 1.

200.

Defendants Majestic, Service 1st, and Armour Settlement wrongly charged Veteran J more than the 1% Flat Charge, as well as Enumerated Fees that exceed reasonable and customary rates.  *See* Exhibit 9.

201.

Veteran J's IRRRL totals $162,574.00; thus the 1% Flat Charge would amount to $1,625.74. *See* Exhibit 9, pp. 1-2.

202.

The total closing costs charged by Defendants to Veteran J (not including charges for purported "discount points" totaling $3,251.48) amount to $3,246.83, broken down as follows:

| | |
|---|---|
| Underwriting Fee | $595.00 |
| Title Search | $495.00 |
| Title Exam | $780.00 |
| Title – Alta 5.1 | $45.00 |

| | |
|---|---|
| Title – Alta 8.1 | $45.00 |
| Title – Alta 9 | $88.80 |
| Title – FL Surcharge | $3.28 |
| Recording Fees | $300.50 |
| Transfer Taxes | $894.25 |
| | |
| Total | $3,246.83 |

Exhibit 9 at p. 2.

203.

The closing costs exceed $1,625.74, the 1% Flat Charge, thus any additional fees must be limited to reasonable and customary "Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

204.

Defendant Majestic charged Veteran J closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates. In some instances, Majestic charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Majestic charged Enumerated Fees that it did not in fact incur or that Majestic marked up beyond reasonable and customary rates.

205.

One unallowable fee charged by Defendant Majestic to Veteran J is $595.00 in "underwriting fees." *See* Exhibit 9 at p. 3, Block A, line 03. An underwriting fee is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge. Moreover, Lenders are specifically prohibited from charging the borrower for broker origination fees. *See* 38 C.F.R. § 36.4313(c).

206.

Defendant Majestic charged Veteran J for both a title search ($495.00) and a title exam ($780.00).  *See* Exhibit 9 at p. 3, Block C, Lines 04 and 07.  A title search is the same this as a title exam: one or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

207.

Moreover, a title examination fee of $780.00 is well above the reasonable and customary amount for a title exam in Florida, particularly in a refinance transaction.

208.

Defendant Majestic marked up the "recording fee" it charged to Veteran J over the actual recording fee paid to Nassau County, Florida.  Nassau County, Florida, where Veteran J's refinanced home was located, charged a recording fee of $205.50. Defendant Majestic falsely inflated the $205.50 recording fee on the closing disclosure to $300.50.  *See* Exhibit 9 at p. 3, Block E, Line 01.

209.

To obtain the VA's guaranty of Veteran J's IRRRL, Defendant Majestic fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

210.

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran J's IRRRL loan closing package, Defendant Majestic knew it was not

complying with the Limited Charges Rule and that Veteran J's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

211.

To close Veteran J's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA.  When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lender's Handbook - VA Pamphlet 26-7.

212.

Relator uses Veteran J's IRRRL as an example of the many IRRRLs Defendant Majestic has fraudulently originated and closed in Florida.  When any of such IRRRLs go into default, the VA will incur damages in amounts to be determined at trial.

213.

Defendants Majestic, Service 1st, and Amour Settlement have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

214.

Given the false $300.50 recording fee and the duplicative false charges for both a title abstract and a title exam on the closing disclosure for Veteran J's IRRRL, that closing disclosure, Exhibit 9 hereto, is a false record created by Defendant Majestic, which Majestic knowingly submitted to the VA to secure the VA's guaranty of Veteran J's IRRRL.

215.

Defendant Majestic has violated the FCA by making and using the false record that is the

closing disclosure, Exhibit 9.

216.

Defendants Majestic, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 9.

217.

(Veteran HU's IRRRL)

Attached as Exhibit 8 is a true and correct copy of a redacted IRRRL closing disclosure created for Veteran HU by Defendant Majestic Home Loan that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement on July 25, 2016.  The collateral for this IRRRL is Veteran HU's home located in East Lansdowne, Pennsylvania.   *See* Exhibit 10 at p. 1.

218.

As evidenced in the closing disclosure, Defendants Majestic Home Loan, Service 1st, and Armour Settlement have charged Veteran HU more than the allowable 1% Flat Charge, as well as Enumerated Fees in excess of reasonable and customary rates.  *See* Exhibit 10, pp. 1-2.

219.

Veteran HU's IRRRL totals $164,750.00; thus the 1% Flat Charge would amount to $2,208.47. *See* Exhibit 10 at p. 1.

220.

The total closing costs charged by Defendants to Veteran HU (not including charges for purported "discount points" totaling $3,295.00) amount to $3,302.25, broken down as follows:

| | |
|---|---|
| Underwriting Fee | $595.00 |
| Lenders Title Insurance Fee | $1,066.25 |
| Title 100 No Viol | $50.00 |
| Title 300 Survey | $50.00 |
| Title 900 Epl-Res | $50.00 |
| Title Closing Svclt | $125.00 |

| | |
|---|---|
| Title Service Fee | $1,105.00 |
| Recording Fees | $300.00 |
| Transfer Taxes | $10.00 |
| | |
| Total | $3,302.25 |

Exhibit 10 at p. 2.

221.

The closing costs of $3,302.25 exceed the 1% Flat Charge; thus, any additional fees must be limited to reasonable and customary "Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

222.

Defendant Majestic charged Veteran HU closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates.  In some instances, Majestic charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Majestic charged Enumerated Fees that it did not in fact incur or that Majestic marked up beyond reasonable and customary rates.

223.

One unallowable fee charged by Defendant Majestic to Veteran HU is $595.00 for an "underwriting fee."  *See* Exhibit 10 at p. 2, Block A, Line 03. An underwriting fee is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge. Lenders are specifically prohibited from charging the borrower for broker origination fees.  *See* 38 C.F.R. § 36.4313(c).

224.

Defendant Majestic charged Veteran HU for both a Lender Title Insurance Fee

($1,066.25) and a Title Service Fee ($1,105.00).  *See* Exhibit 8 at p. 2 Block C, Lines 01 and 06.

Defendant Majestic further charged Veteran HU for $275 in additional title fees ("Title – 100 No

Viol," $50.00; "Title – 300 Survey," $50.00; "Title – 900 EplRes," $50.00; and "Title – Closing

Svclt," $125.00).  These fees are duplicative because Pennsylvania is an all-inclusive rate state,

meaning the title insurance fee includes "the premium, the examination and settlement or closing

fees, and every other charge, whether denominated premium or otherwise, made by a title

insurance company, agent of a title insurance company or an approved attorney of a title

insurance company, or any of them, to an insured or to an applicant for insurance, for any policy

or contract for the issuance of, or an application for any class or kind of, title insurance" with

limited exceptions for "special services."  40 P.S. § 910-1 (5).  All fees other than the title

insurance fee are not allowable and are therefore not at reasonable and customary rates.

225.

Defendant Majestic charged Veteran HU 200% more than the actual "recording fee" paid

to Delaware County, Pennsylvania.  Delaware County, where Veteran HU's refinanced home

was located, charged a recording fee of $86.75 for the first 4 pages and $4.00 for each

subsequent page.  The false $300.00 "recording fee" is false and is not reasonable and

customary.  *See* Exhibit 10 at p. 2, Block E, line 01.

226.

Defendants Majestic and Armour Settlement inflated the "Taxes and Other Government

Fees" charged to Veteran HU.  Pennsylvania does not collect transfer taxes on refinance

transactions.  Defendant Majestic Home Loan charged Veteran HU transfer taxes of $10.00,

which was not reasonable and customary.  *See* Exhibit 10 at p. 2.

227.

To obtain the VA's guaranty of Veteran HU's IRRRL, Defendant Majestic fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

228.

When Defendant Majestic submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran HU's IRRRL closing package, Defendant Majestic knew it was not complying with the Limited Charges Rule and that Veteran P's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

229.

To close Veteran HU's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA.  When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

230.

Relator uses Veteran HU's IRRRL as an example of the many IRRRLs Defendant Majestic has fraudulently originated and closed in Pennsylvania.  When any of such IRRRLs go into default, the VA will incur damages in amounts to be determined at trial.

231.

Defendants Majestic, Service 1st, and Amour Settlement have violated the FCA by

conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

232.

Given the false $300.00 recording fee and the duplicative false charges for title related services in addition to the title service fee on the closing disclosure for Veteran HU's IRRRL, that closing disclosure, Exhibit 10 hereto, is a false record created by Defendant Majestic, which Majestic knowingly submitted to the VA to secure the VA's guaranty of Veteran P's IRRRL.

233.

Defendant Majestic has violated the FCA by making and using the false record that is the closing disclosure.

234.

Defendants Majestic Home Loan, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 10.

235.

(Veteran E's IRRRL)

Attached as Exhibit 11 is a true and correct copy of a closing disclosure created by Defendant Lender Mortgage Solutions that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement.  The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes.  This closing disclosure is for an IRRRL that closed on September 2, 2016.  The collateral for this IRRRL is Veteran E's home in Essex, Maryland.  *See* Exhibit 11 at p. 1.

236.

As evidenced by the closing disclosure, Defendants Mortgage Solutions of Colorado,

Service 1st, and Armour Settlement have charged Veteran E more than the 1% Flat Charge, as well as Enumerated Fees that exceed reasonable and customary rates.  *See* Exhibit 11.

237.

Veteran E's IRRRL totals $258,586.00; thus the 1% Flat Charge would amount to $2,585.86.  *See* Exhibit 11.

238.

The total closing costs charged by Defendants to Veteran E (not including charges for purported "discount points" totaling $2,277.13) amount to $4,209.00, broken down as follows:

| | |
|---|---|
| Mortgage Broker Fee | $2,544.00 |
| Title Abstract | $295.00 |
| Title Binder Fee | $295.00 |
| Title Examination | $655.00 |
| Recording Fees | $110.00 |
| State Mortgage Tax/Stamp Fee | $300.00 |
| | |
| Total | $4,209.00 |

Exhibit 11 at p.2.

239.

The closing costs exceed $2,585.86, the 1% Flat Charge; thus, any additional fees must be limited to reasonable and customary "Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

240.

Defendant Mortgage Solutions charged Veteran E closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates.  In some instances, Defendant Mortgage Solutions charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Defendant Mortgage Solutions charged

Enumerated Fees that it did not in fact incur or that Majestic marked up beyond reasonable and customary rates.

<div align="center">241.</div>

One unallowable fee charged by Defendant Mortgage Solutions to Veteran E is $2,544 for a "Mortgage Broker Fee." *See* Exhibit11 at p. 2, Block A, line 02.  A broker fee is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge. Moreover, Lenders are specifically prohibited from charging the borrowers for broker fees. *See* 38 C.F.R. § 36.4313(c).

<div align="center">242.</div>

In addition to the unallowable broker fee, Defendant Mortgage Solutions charged Veteran E for both a title abstract ($295.00) and a title exam ($655.00). *See* Exhibit 11 at p. 2 Block B, lines 01 and 03. A title abstract is the same thing as a title exam: one or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

<div align="center">243.</div>

Moreover, the title examination fee of $655.00 is well above the reasonable and customary charge for title exam in Maryland, particularly in a refinance transaction.

<div align="center">244.</div>

Defendant Mortgage Solutions falsely inflated the "recording fees and taxes" charged to Veteran E.  Baltimore County, Maryland, where Veteran E's refinanced home was located, charged a recording charge of $20.00, a surcharge of $40.00, and a state recordation tax of $72.50 for a total of $132.50. Defendant Mortgage Solutions falsely shows the $60.00 recording fee on the closing disclosure as $110.00; and the $72.50 recordation tax is shown on the closing disclosure as $300.00.

245.

Defendant Mortgage Solutions charged Veteran E $295.00 for a "Title – Binder." *See* Exhibit 11 at p. 2, Block C, line 02.  That is in excess of the reasonable and customary rate for a title binder in Maryland. At title binder is the act of the closing agent obtaining a commitment for title insurance from the title insurance company based on the results of a title examination. A title binder is customarily no more than $50.00.

246.

To obtain the VA's guaranty of Veteran E's IRRRL, Defendant Mortgage Solutions fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.).

247.

When Defendant Mortgage Solutions submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran E's IRRRL closing package, Defendant Mortgage Solutions knew it was not complying with the Limited Charges Rule and that Veteran E's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

248.

To close Veteran EI's IRRRL on an automatic basis, which it did, Defendant Mortgage Solutions falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA. When it submitted Form 26-8736, Defendant Mortgage Solutions knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA

Pamphlet 26-7.

<div align="center">249.</div>

Relator uses Veteran E's IRRRL as an example of the many IRRRLs Defendant

Mortgage Solutions has fraudulently originated and closed.  When any of such IRRRLs go into

default, the VA will incur damages in amounts to be determined at trial.

<div align="center">250.</div>

Defendant's Mortgage Solutions, Service 1st, and Armour Settlement have violated the

FCA by conspiring to cause false claims to be submitted to the VA following default on their

fraudulently closed IRRRLs.

<div align="center">251.</div>

Given the false $110.00 recording fee and the duplicative false charges for both a title

abstract and a title exam on the closing disclosure for Veteran EI's IRRRL, that closing

disclosure, Exhibit 11 hereto, is a false record created by Defendant Mortgage Solutions which

record Mortgage Solutions knowingly submitted to the VA to secure the VA's guaranty of

Veteran E's IRRRL.

<div align="center">252.</div>

Defendant Mortgage Solutions has violated the FCA by making and using the false

record that is the closing disclosure, Exhibit 11.

<div align="center">253.</div>

Defendants Mortgage Solutions, Service 1st, and Armour Settlement have violated the

FCA by conspiring to make and use the false record that is Exhibit 11.

254.

(Veteran D's IRRRL)

Attached as Exhibit 12 is a true and correct copy of a closing disclosure created by Defendant Lender Freedom Mortgage that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement. The name of the veteran borrower and the street address of the veteran's home have been redacted for privacy purposes. This closing disclosure is for an IRRRL that closed on July 27, 2016. The collateral is Veteran D's home in Clarksville, Tennessee. See Exhibit 12 at p. 1.

255.

As evidenced by the closing disclosure, Defendants Freedom, Service 1st, and Armour Settlement have charged Veteran D more than the 1% Flat Charge as well as Enumerated Fees that exceed reasonable and customary rates. *See* Exhibit 12 at pp. 1-2.

256.

Veteran D's IRRRL totals $165,774.00; thus the 1% Flat Charge would amount to $1,657.74. *See* Exhibit 12.

257.

The total closing costs charged by Defendants to Veteran D (not including for purported "discount points" totaling $2,693.83) amount to $2,839.37, broken down as follows:

| | |
|---|---|
| FMC Origination Charge | $199.00 |
| Title Abstract | $195.00 |
| Title Examination | $670.00 |
| Title Insurance Binder Fee | $295.00 |
| Lenders Title Insurance Fee | $1,091.00 |
| Recording Fees | $200.00 |
| State Tax Stamp | $189.37 |
| | |
| Total | $2,839.37 |

Exhibit 12 at p. 2.

258.

The closing costs exceed $1,657.74, the 1% Flat Charge, thus any additional fees must be limited to reasonable and customary "Enumerated Fees." *See* 38 C.F.R. § 36.4313(d)(1); *see also* 38 U.S.C. § 3703(c)(1).

259.

Defendant Freedom charged Veteran D closing costs above the 1% Flat Charge that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates. In some instances, Freedom charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Freedom charged Enumerated Fees that it did not in fact incur or that Freedom marked up beyond reasonable and customary rates.

260.

One unallowable fee charged by Defendant Freedom to Veteran D is $199.00 for "FMC Origination Charge." *See* Exhibit 12 at p. 2, Block A, line 02.  An origination charge is not an Enumerated Fee and is thus not chargeable to the borrower outside of the 1% Flat Charge. Borrowers are specifically prohibited from paying broker origination fees.  *See* 38 C.F.R. § 36.4313(c).

261.

In addition to the unallowable origination charge, Defendant Freedom charged Veteran D for both a Title Abstract/Search ($195.00) and a Title Examination ($670.00). *See* Exhibit 12 at p. 2, Block B, line 02 and 04. A title abstract/search is the same thing as a title examination: one

or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

262.

Moreover, the title examination fee of $670.00 is well above the reasonable and customary charge for a title exam in Tennessee, particularly for a refinance transaction.

263.

Defendant freedom marked up the "recording fees" it charged to Veteran D over the actual recording fees paid to Montgomery County, Tennessee. Montgomery County, where Veteran D's refinanced home was located, charged a recording fees and taxes of $306.34 ($115.00 in recording fees; $191.34 in taxes). Defendant Freedom falsely inflated the $306.34 recording fees and taxes on the closing disclosure to $389.37. *See* Exhibit 12 at p.2, Block E 02 and 03.

264.

In Tennessee, title insurance companies are required to follow the rates for title related fees that they submit in rate manuals filed with the Tennessee Insurance Commissioner's Office. According to the SERFF database (where such rate manuals are on record and available to the public), Defendant Armour has never submitted rates to the Commissioner's Office. However, Stewart Title Guaranty Company (which also performed title related work on this IRRRL) has submitted its rate manual to the Commissioner's Office.  Those submitted rates demonstrate that the charges for title related work assessed to the borrower on this IRRRL were unreasonably high. In addition to being unreasonably high, certain of the title related fees charged to the borrower on this IRRRL are duplicative.

265.

Defendant Freedom charged the borrower $295.00 for a "Title Insurance Binder Fee."

Exhibit 12, p. 2, Line B05. That amount is in excess of the reasonable and customary rate for a title binder in Maryland. A title binder is the act of the closing agent obtaining a commitment for title insurance from the title insurance company based on the results of a title examination. A title binder is customarily no more than $50.00.

<div align="center">266.</div>

Defendant Freedom Mortgage charged the borrower $1,091.00 for "Lender's Title Insurance" made payable to Stewart Title Guaranty Co.  Exhibit 12, p. 2, Line B06.  The Stewart Title Rate Manual provides the filed schedule for Title Insurance Rates that govern the Title Insurance fees that should have been charged to the borrower on this IRRRL.  The Stewart Title Fee Schedule provides a graduated scale of Title Insurance rates that charges $4.25/$1,000 on the first $50,000.00; $3.00/$1,000 on the next $50,000.00; and $2.50/$1,000 on each $1,000.00 unit up to $5,000,000.00. The Stewart Title Rate Manual provides a 30% discount for title insurance policies on refinanced properties: "Refinance Charge shall be seventy percent of the original issue charges up to the coverage amount of the previous policy. *Id*.  For a loan amount of $165,774.00 the Lender's title insurance charge should have been $369.25 (50 x $4.25 + 50 x $3.00 + 66 x $2.50).  Therefore, Defendant Freedom Mortgage charged the borrower $721.75 above reasonable and customary rates for Lender's Title Insurance.

<div align="center">267.</div>

To obtain the VA's guaranty of Veteran D's IRRRL, Defendant Freedom Mortgage fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that Veteran D's IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

268.

When Defendant Freedom Mortgage submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran D's IRRRL closing package, Defendant Majestic knew it was not complying with the Limited Charges Rule and that Veteran D's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

269.

To close Veteran D's IRRRL on an automatic basis, which it did, Defendant Majestic falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA. When it submitted Form 26-8736, Defendant Majestic knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

270.

Relator uses Veteran D's IRRRL as an example of the many IRRRLs Defendant Freedom Mortgage has fraudulently originated and closed. When any of such IRRRLs go into default, the VA will incur damages in amounts to be determined at trial.

271.

Defendants Freedom Mortgage, Service 1st and Amour have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

272.

Given the false recording fee and the duplicative false charges for both a title abstract/search and a title exam on the closing disclosure for Veteran D's IRRRL, that closing disclosure, Exhibit 12 hereto, is a false record created by Defendant Freedom which Freedom

knowingly submitted to the VA to secure the VA's guaranty of Veteran D's IRRRL.

273.

Defendant Freedom has violated the FCA by making and using the false record that is the closing disclosure, Exhibit 12.

274.

Defendant Freedom, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 12.

275.

(Veteran DO's IRRRL)

Attached as Exhibit 13 is a true and correct copy of a closing disclosure created by Defendant Lender Loan Depot that was brokered by Defendant Service 1st and closed by Defendant Armour Settlement. The name of the borrower and the street address of the veteran's home have been redacted for privacy purposes. This closing disclosure is for an IRRRL that closed on February 22, 2016. The collateral for this IRRRL is Borrower DO's home in Annapolis, Maryland. *See* Exhibit 13 at p. 1.

276.

Defendant Loan Depot charged Veteran DO closing costs that are unallowable or are allowable in type because they are Enumerated Fees, but that grossly exceed reasonable and customary rates. In some instances, Loan Depot charged Enumerated Fees that are not reasonable and customary because they are duplicative of one another; in other instances, Loan Depot charged Enumerated Fees that it did not in fact incur or that Loan Depot marked up beyond reasonable and customary rates.

277.

Defendant Loan Depot charged Veteran DO for both a title abstract ($295.00) and a title exam ($745.00). *See* Exhibit 13 at p. 2, Block B, line 02 and 04. A title abstract is the same thing as a title exam: one or the other of these fees was not in fact incurred and therefore is not reasonable and customary.

278.

Moreover, the title examination fee of $750.00 is well above the reasonable and customary charge for a title exam in Maryland, particularly for a refinance.

279.

Defendant Loan Depot marked up the "recording fee" it charged to Veteran DO almost 100% over the actual recording fee paid to Anne Arundel County, Maryland.  Anne Arundel County, Maryland, where Veteran DO's refinanced home was located, charged a recording fee of $60.00 ($20.00 "recording charge" + $40.00 "surcharge") as evidenced by the Deed of Trust for Veteran DO's IRRRL.  Defendant Loan Depot falsely inflated the $60.00 recording fee on the closing disclosure to fully $110.00.  *See* Exhibit 13 at p. 2, Block E, line 01.

280.

Defendant Loan Depot charged Veteran DO $395.00 for a "Title – Binder."  *See* Exhibit 13 at p. 2, Block B, line 03. That amount is in excess of the reasonable and customary rate for a title binder in Maryland. A title binder is the act of the closing agent obtaining a commitment for title insurance from the title insurance company based on the results of a title examination. A title binder is customarily no more than $50.00.

281.

Defendant Loan Depot charged Veteran DO 2.125 "discount points," or $6,818.55.  No

more than 2 discount points can be rolled into the loan amount on an IRRRL.  *See* 38 C.F.R. §
36.4307(a)(4)(i).   Defendant Loan Depot rolled 2.125 purported discount points into Veteran
DO's loan amount in contravention of Rule 36.4307(a)(4)(i).  *See* Exhibit 13, p. 2, Block A, line
01.

<div align="center">282.</div>

Veteran DO's closing disclosure shows that Veteran DO was charged $6,818.55 for
2.125 "discount points" that purportedly reduced Veteran DO's interest rate to 2.25%  The
closing disclosure also shows that Defendant Loan Depot paid Defendant Service 1st $6,417.46
in "Lender Paid Broker Compensation."

<div align="center">283.</div>

The "discount points" charged by Defendant Loan Depot to Veteran DO are not actual
discount points but are in fact mislabeled unallowable brokerage fees.

<div align="center">284.</div>

Defendant Loan Depot structured Veteran DO's IRRRL as a lender paid compensation
deal.  *See* Exhibit 13, at p. 2, Block A, Line A02.  In a lender paid compensation model, lenders
allow brokers up to 2% of the loan amount in broker compensation. Veteran DO's closing
disclosure shows that Defendant Service 1st received $6,417.46 in broker compensation or 2% of
the loan amount.  *See* Exhibit 13, at p.2, Block A, Line A02.

<div align="center">285.</div>

The lender-paid broker compensation of $6,417.46 resulted from Loan Depot and
Defendant Service 1st collaborating to "eat" the borrower's credit, as explained *supra*.  In this
instance, Veteran DO should have been credited 2 points on the 2.25% interest rate. Instead, the
borrower was charged 2.25 "discount points" to secure an interest rate the borrower was already

entitled to, and Defendant Loan Depot passed that money on to Defendant Service 1st.

286.

To obtain the VA's guaranty of Veteran DO's IRRRL, Defendant Loan Depot fraudulently certified to the VA in VA Forms 26-1820 and 26-1802a that it had complied and would continue to comply with the Limited Charges Rule, specifically, and that the IRRRL conformed to the applicable provisions of Title 38 of the U.S. Code and the VA regulations concerning the guaranty of loans to veterans.  (*See* Section VI, *supra*.)

287.

When Defendant Loan Depot submitted VA Forms 26-1820 and 26-1802a to the VA in connection with Veteran DO's IRRRL loan closing package, Defendant Loan Depot knew it was not complying with the Limited Charges Rule and that Veteran DO's IRRRL did not conform to applicable provisions of Title 38 of the U.S. Code or the VA Limited Charges Rule.

288.

To close Veteran DO's IRRRL on an automatic basis, which it did, Defendant Loan Depot falsely certified to the VA in VA Form 26-8736 that it would comply with the provisions of Title 38 of the U.S. Code, VA regulations and other directives issued by VA.  When it submitted Form 26-8736, Defendant Loan Depot knew it was not complying with Title 38 of the U.S. Code, the Limited Charges Rule or the Lenders Handbook – VA Pamphlet 26-7.

289.

Relator uses Veteran DO's IRRRL as an example of the many IRRRLs Defendant Loan Depot has fraudulently originated and closed.  When any of such IRRRLs go into default, the VA will incur damages in amounts to be determined at trial.

290.

Defendants Loan Depot, Service 1st, and Armour Settlement have violated the FCA by conspiring to cause false claims to be submitted to the VA following default on their fraudulently closed IRRRLs.

291.

Given the false recording fees and the duplicative false charges for both title abstract and title exam on the closing disclosure for Veteran DO's IRRRL, that closing disclosure, Exhibit 13 hereto, is a false record created by Defendant Loan Depot which record Loan Depot knowingly submitted to the VA to secure the VA's guaranty of Veteran DO's IRRRL.

292.

Defendant Loan Depot has violated the FCA by making and using the false record that is the closing disclosure.

293.

Defendants Loan Depot, Service 1st, and Armour Settlement have violated the FCA by conspiring to make and use the false record that is Exhibit 13.

294.

As illustrated by Table 1, below, Relator has fully 10 closing disclosures created by Defendant Majestic, Defendant Mortgage Solutions of Colorado, and Defendant Loan Depot that were brokered by Defendant Service 1st for veterans with homes in Maryland.

295.

Defendant Lenders have fraudulently charged IRRRL borrowers in Maryland inflated recordation fees and bogus transfer taxes, which are not collected in Maryland on refinance transactions.  Each closing disclosure demonstrates Defendants' false charges in the "Taxes and

Other Government Fees" section.  The Deeds of Trust for each IRRRL reflect the actual "Taxes

and Other Government Fees" that were paid to the county in which the collateral property sits

and are shown below in Table 1.  All of the transfer taxes shown on each closing disclosure are

false charges. When compared to the corresponding closing disclosure, each Deed of Trust

establishes Defendant Lenders' false charges to IRRRL borrowers in Maryland.

Table 1

| Veteran Borrower | Lender | Closing Disclosure | | Reflected on Deed of Trust | | | Total Over charges |
|---|---|---|---|---|---|---|---|
| | | Recording Fees | Transfer Taxes | Recording Fees | Recordation Tax | | |
| S | Majestic | $110.00 | $300.00 | $60.00 | $127.10 | | $222.90 |
| L | Majestic | $110.00 | $300.00 | $60.00 | $130.00 | | $220.00 |
| BA | Majestic | $110.00 | $230.25 | $60.00 | $57.75 | | $222.50 |
| H | Mortgage Solutions of CO | $125.00 | $60.00 "State Mortgage Tax/ Stamp Fee" | $60.00 | $15.00 | | $110.00 |
| G | Majestic | $110.00 | $300.00 | $60.00 | $60.00 | | $290.00 |
| F | Majestic | $110.00 | $300.00 | $60.00 | $60.50 | | $289.50 |
| E | Mortgage Solutions of CO | $110.00 | $300.00 "State Mortgage Tax/ Stamp Fee" | $60.00 | $72.50 | | $277.50 |
| DG | Loan Depot | $110.00 | $108.50 | $60.00 | $108.50 | | $50.00 |
| C | Majestic | $110.00 | $300.00 | $60.00 | $85.25 | | $267.50 |
| CR | Majestic | $110.00 | $300.00 | $60.00 | $101.50 | | $248.50 |

**(Unallowable Broker Fees Disguised as "Discount Points")**

296.

Defendant Lenders and Defendant Service 1st charge IRRRL borrowers unallowable

broker fees and disguise them as "discount points."  They then roll those funds into the loan

amount financed in the IRRRL.   The VA regulations specifically prohibit (1) charging the borrower for broker fees and (2) paying broker fees by adding them into the loan amount.  *See* 38 C.F.R § 36.4313(b) ("No brokerage or service charge or their equivalent may be charged against the debtor or the proceeds of the loan either initially, periodically, or otherwise.").

<div align="center">297.</div>

By mislabeling broker fees, which are not chargeable to the borrower, as "discount points," which, if legitimate, may be charged to the borrower, Defendant Lenders unlawfully impose their origination costs on the borrower, violating the IRRRL Program's explicit prohibition on charging the borrower for broker fees.  *Id.*  Defendants' intentional misuse of the term, "discount points" violates an explicit purpose of the IRRRL Program, to get veterans into lower interest rate loans *without* charging the borrowers for broker fees. *Id.*

<div align="center">298.</div>

As set forth above, the Lender may only charge the 1% Flat Charge and then Enumerated Fees at reasonable and customary rates.

<div align="center">299.</div>

Defendant Lenders and Defendant Service 1st mislabeled broker fees as "discount points" to work around the 1% Flat Charge cap.  Instead of Defendant Lenders paying the broker origination fee to Defendant Service 1st out of the 1% Flat Charge, Defendants have the unsuspecting borrower pay that fee.  The borrower thinks he is buying down his interest rate by paying those "discount point" dollars.  In reality, those funds did not buy down the borrower's interest rate. This scheme maximizes broker compensation (benefiting Service 1st) and grows the size of the loan (benefiting the Defendant Lenders who sell IRRRLs on the secondary market). The result is that the veteran pays for an interest rate that he was already entitled to get without

the benefit of buying down the loan rate through the payment of legitimate discount points.  The VA guarantees a loan that it would not have guaranteed but for Lender's false certifications that it is not charging the veteran prohibited broker fees.

300.

In addition, the mislabeling of broker fees as discount points makes the closing disclosure a false statement or record material to a claim, in violation of the FCA.

301.

According to federal regulations, IRRRL borrowers can elect to buy down the interest rate offered by a lender by paying for "discount points." *See* 38 C.F.R. § 36.4313(6)(i).  The cost of up to two (legitimate) discount points can be rolled into the IRRRL amount, thereby increasing the debt owed by the veteran and the size of the VA's exposure on the guaranty, but ultimately providing the veteran with a lower mortgage interest rate.  *See* 38 C.F.R. § 4307; *see also* Lenders Handbook – VA Pamphlet 26-7, Ch. 8, 8-15(c) ("no more than two discount points can be included in the loan amount.").   Moreover, the IRRRL Program requires legitimate discount points charged to a veteran borrower to be "reasonable."  38 C.F.R. § 36.4312(b).

302.

For discount points to be legitimate, the funds paid for them by the veteran borrower must in fact buy down the interest rate offered by the lender, who receives money up front to garner the lower interest rate for the life of the loan.  *See* 15 U.S.C. § 1639c(b)(2)(C)(iii) (defining discount points as those "knowingly paid by the consumer for the purpose of reducing, and which in fact result in a bona fide interest rate or time-price differential applicable to the mortgage").

303.

Fees charged to the borrower as" discount points," which do not in reality buy down the veteran borrower's interest rate, can only properly be assessed to the borrower as part of the lender's 1% Flat Charge. That means that only 1% in broker fees can be charged to the borrower in compliance with applicable IRRRL Program rules.

304.

Service 1st used the term "eating the borrower's credit" to describe the mislabeled-broker-fees-as-discount-points scheme.  The scheme works as follows: Defendant Lenders employ two models of paying broker origination fees in an IRRRL closing.  In one, called a "Borrower Paid Compensation" model ("Borrower Paid"), the borrower pays the broker's compensation, which means the 1% Flat Charge is paid to the broker.  In the other model, the "Lender Paid Compensation" model ("Lender Paid"), Service 1st received 2% of the loan amount via getting paid the funds mislabeled as "discount points" plus "eating"/being paid the credit that the borrower should have received against closing costs because the borrower's new interest rate was achievable without paying the discount points charged.

305.

When the Lender and Service 1st use the Borrower Paid model, because the VA regulations cap the origination fee at 1% in the 1% Flat Charge, the broker's compensation is capped at 1% of the loan amount. *See* 38 C.F.R. § 36.4313.   When the Lender and Service 1st use the Lender Paid model and charge the borrower 2% in phony "discount points," Service 1st gets 2% of the loan amount. This scheme also creates room in the 1% Flat Charge for other bogus or inflated fees because legitimate discount points are Enumerated Fees that can be charged outside and above the 1% Flat Charge.

306.

The credit that the borrower should be getting, that is "eaten" in Defendants' scheme, is the value of what legitimate discount points would provide in terms of buying down the interest rate.  As described above, Defendant Lenders use rate sheets or "pricing specials" to inform Service 1st what interest rates are available to IRRRL borrowers on a given day. Each Rate Sheet shows the "price" of each interest rate expressed in terms of the amount of points it will cost for a borrower to secure a given interest rate. The rate sheets are built off of the "PAR" interest rate for each day, which rate is tied to the yield of US Treasury bonds, the 1-year CMT for ARMs and the 10 Year Treasury Note yield for fixed rates.  In a situation in which the lender was using real discount points that would in fact buy down the interest rate, depending on where PAR is on a given day, an interest rate can either "cost" the borrower discount points or "credit" the borrower discount points.  If the rate sheet reflects that an interest rate "credits" the borrower points, that percentage of the loan amount should be credited back to the borrower against closing costs. The Defendant Lenders and Service 1st accomplish the discount points fraud by doing what Service 1st called "eating the credit." The specifics of how the Defendant Lenders and Service 1st perpetrate this fraud is set out below in Exhibit 14, a Defendant SunWest IRRRL closing package.

307.

Attached as Exhibit 14 is a true and correct copy of a Defendant SunWest closing package, redacted to protect the privacy of the borrower.  The closing package is typical of the IRRRL closing packages used by each Defendant Lender.  It is 169 pages long and includes a Loan Detail Report that compares the loan being refinanced to the IRRRL, and a closing disclosure that shows all closing costs and how the money from the refinance (the "loan

proceeds") is paid out, why and to whom.

308.

The exemplary "Loan Detail Report" indicates that Veteran ES' interest rate of 2.25% was locked in on June 27, 2016.  *See* Exhibit 14, p. 4.  The SunWest "Rate Sheet" for June 27, 2016 is attached hereto as Exhibit 15.

309.

The closing disclosure shows that Veteran ES' IRRRL was in the amount of $241,434. Exhibit 14, p.1.   Veteran ES received a 2.25% interest rate.  Exhibit 14, p. 4.

310.

The SunWest Rate Sheet demonstrates that instead of being charged $4,804.54 to receive the 2.25% interest rate, Veteran ES should have been *credited* $53.12 against his closing costs. Below is the pricing table from the Rate Sheet:

| FHA / VA 3/1 ARM 2.00% Margin | | | | |
|---|---|---|---|---|
| Interest Rate | 15 Day | 30 Day | 45 Day | 60 Day |
| 2.250 | -0.382 | -0.342 | -0.322 | -0.022 |
| 2.375 | -0.506 | -0.466 | -0.446 | -0.146 |
| 2.500 | -0.560 | -0.520 | -0.500 | -0.200 |
| 2.625 | -0.739 | -0.699 | -0.679 | -0.379 |
| 2.750 | -0.789 | -0.749 | -0.729 | -0.429 |
| 2.875 | -0.839 | -0.799 | -0.779 | -0.479 |
| 3.000 | -0.889 | -0.849 | -0.829 | -0.529 |
| 3.125 | -0.939 | -0.899 | -0.879 | -0.579 |
| 3.250 | N/A | N/A | N/A | N/A |
| 3.375 | N/A | N/A | N/A | N/A |
| 3.500 | N/A | N/A | N/A | N/A |
| 3.625 | N/A | N/A | N/A | N/A |
| 3.750 | N/A | N/A | N/A | N/A |
| 3.875 | N/A | N/A | N/A | N/A |

311.

In order to have received a 2.25% interest rate on a 60-day rate lock period on June 27, 2016, Veteran ES should have been credited 0.022 points/ 0.022% of the loan amount against the closing costs.  That credit on the $241,434.00 loan amount amounts to $53.12.

312.

The closing disclosure shows that Veteran ES paid $4,804.54 for 1.990 "discount points;" and that Defendant Service 1st was paid $4,828.68 in broker fees.  *See* Exhibit 14, pp. 81-85. Veteran ES was not only denied the credit, he was fraudulently charged 1.99 discount points, fully $4,804.54, to obtain the interest rate he was entitled to without paying anything.

313.

Defendant SunWest and Defendant Service 1st structured this IRRRL using the Lender Paid model, which resulted in the broker's compensation "eating the borrower's credit." Specifically, Defendant SunWest and Defendant Service 1st offset the 2% broker fee against the 0.022 discount point credit to which the veteran borrower was entitled.  Thus, the veteran borrower *paid* $4,804.54 for 1.990 discount points (2% minus 0.022%) to receive an interest rate for which he was *already* eligible while also unknowingly *surrendering* the 0.022% credit he should have received against his closing costs if he had been paying legitimate discount points. Defendant Lender allowed Service 1st to absorb the borrower's credit and paid Service 1st the 1.99% in mislabeled discount points.

314.

The VA has no realistic means of detecting Defendants' intentional and convert scheme of passing along to the borrower the broker's fees (2% of the loan value) disguised as discount points (2% minus any borrower credit that is "eaten").  This is a clear violation of the FCA,

benefiting Defendants and harming veterans and the public fisc that only an insider like Relator could successfully expose.

<u>False Claims/The VA Claims Process</u>

315.

Defendant Lenders usually sell the right to service the loan (collect the payments and be paid for that service) and the value of the interest payments themselves (commonly known as the "coupon") to third parties.  It is the entity that is servicing the IRRRL that is responsible for notifying the VA of a default.   VA. 38 C.F.R. § 36.4317; *See also* VA Loan Electronic Reporting Interface – VA Servicer Guide, Chapter 4.2

316.

When an IRRRL fraudulently originated by Defendants enters default, the IRRRL servicer is responsible for reporting the delinquency to the VA by submitting an Electronic Default Notification ("EDN") through VALERI.  *See* 38 C.F.R. § 36.4317; *see also* VALERI Servicer Guide, Chapter 4.2.

317.

A default becomes reportable to the VA when the veteran borrower is at least 61 days delinquent in his payments.  *See* 38 C.F.R. § 36.4317(c)(7); *see also* VALERI Servicer Guide, Chapter 4.2(A loan becomes delinquent when a borrower misses one or more mortgage payments).

318.

The VA directs IRRRL servicers to take the following four preliminary steps in the VA-required "Delinquent Loan Servicing Process" before submitting an EDN: (1) contact the borrower; (2) attempt to collect payments; (3) order property inspections; and (4) protect and

preserve the value of the subject property.  *See* VALERI Servicer Guide, Chapter 4.2.  Only after

the IRRRL has been delinquent for 60 days (two missed monthly payments) can the servicer

report the delinquency to the VA through VALERI.  *See* 38 C.F.R. § 36.4317.

319.

Upon the 61st day of a veteran borrower's delinquency, an IRRRL servicer should submit

through VALERI an EDN, which contains information on the IRRRL, the veteran borrower, and

the reason for the default. The EDN is due "by the seventh day after the 61st calendar day of

delinquency."  VALERI Servicer Guide, Chapter 4.2.

320.

Upon receiving the EDN, which is commonly referred to as a Notice of Default or

"NOD," the VA-Guarantor may: (1) work with the veteran borrower to cure the

delinquency/default; (2) pursue forbearance, re-amortization, modification and/or repayment; (3)

provide VA financial assistance; (4) authorize the private sale of the property, with the VA

paying part of the loan balance based on the guaranty; (5) obtain a deed in lieu of foreclosure

from the veteran borrower, with the VA paying part of the loan balance based on the guaranty;

(6) authorize the lender to foreclose and purchase the foreclosed property from the lender for the

loan amount; or (7) allow foreclosure and pay the holder under the terms of the guaranty.  The

VA has more frequently elected to exercise Option (6) over the last few years, and the

unintended but serious consequence has resulted in even larger losses to the Government.

321.

An IRRRL servicer may claim a monetary bonus from the VA for successfully managing

an IRRRL default.  *See* 38 C.F.R. § 36.4319, Servicer Loss Mitigation Options and Incentives

("The Secretary will pay a servicer . . . an incentive payment for each of the following successful

loss-mitigation options or alternatives to foreclosure completed: repayment plans, special

forbearance agreements, loan modifications, compromise sales, and deeds in lieu of

foreclosure").

322.

The Government has incurred and will incur enormous damages from IRRRLs that go

into default as well as from IRRRLs that are cured from default prior to foreclosure.  One of the

most expensive alternatives to foreclosure which is frequently pursued by the VA is a

"refunding" of the IRRRL, wherein the United States taxpayers purchase the entire loan, pay the

lender or holder in due course in full, and assume the entire indebtedness.  *See* 38 C.F.R. §

36.4320(a); *see generally*, VALERI Servicer Guide.

323.

If post-default intervention measures are not successful and the holder of the loan

undertakes foreclosure, the VA incurs considerable administrative expenses in overseeing the

foreclosure process.  *See* 38 C.F.R. § 36.4322.  The VA incurs considerable administrative

expense in overseeing the foreclosure process. At least 30 days prior to the scheduled liquidation

sale, the holder must request that the VA assign an appraiser to conduct a liquidation appraisal.

*Id.*

324.

Within 1 year after the completion of the foreclosure liquidation sale, the lender (or

current holder) may submit a claim under the VA's IRRRL guaranty through VALERI;

thereafter, the VA electronically approves the guaranty claim and pays the holder according to

the terms of the guaranty.  *See* 38 C.F.R. § 36.4324.

Conspiracy Allegations

325.

Conspiratorial agreements existed and continue to exist among Defendant Lenders, Defendant Service 1st, and Defendant Title Companies to defraud the United States and obtain VA-guaranteed IRRRLs under false pretenses by:  (1)  identifying veterans with existing VA-backed mortgage loans; (2) convincing veterans to refinance their mortgages with IRRRLs, which become valuable financial products for Defendants; (3) charging veteran borrowers excessive and prohibited closing costs and unallowable broker fees disguised as discount points; (4) creating closing disclosures that involve excessive and prohibited fees and unallowable broker fees disguised as discount points; (5) submitting false statements (i.e., closing disclosures) to the VA in order to obtain guaranties on each IRRRL closed; (6) making multiple false certifications to the VA in order to obtain authorization to close IRRRLs on an automatic, non-supervised basis and to obtain the VA's guaranty on each IRRRL closed; and (7) paying and receiving remuneration in the form of marketing services and free advertising.

326.

Each Defendant was knowingly complicit in the conspiratorial agreement described herein.

327.

Each of Defendant Lenders' false certifications to the VA, as described herein, is an overt act in furtherance of the conspiracy to defraud the United States and to obtain under false pretenses the VA's guaranty of each IRRRL closed.

328.

Each of Defendant Service 1st's telephone calls to veterans to convince them to refinance

their mortgages with IRRRLs under fraudulent terms dictated by Defendant Lenders and replete with Defendant Title Companies' excessive and prohibited fees is an overt act in furtherance of the conspiracy to defraud the United States and to obtain under false pretenses the VA's guaranty of each IRRRL closed.

329.

Each of Defendant Title Companies' settlements of IRRRLs with unallowable, duplicative or excessive closing costs on the closing disclosures is an overt act in furtherance of the conspiracy to defraud the United States and to obtain under false pretenses the VA's guaranty of each IRRRL closed.

## VIII.   DAMAGES

### Impact of Defendants' Fraud on the American Taxpayers

330.

Each year the VA presents Congress with consolidated financial statements, known as Performance and Accountability Reports ("PAR").  The PAR reports provide specific calculations regarding the VA costs associated with defaults, foreclosures, and claim payments to lenders.  The PAR reports submitted to Congress reflect that United States taxpayers made payments totaling in excess of $6.3 billion to lenders on VA-guaranteed direct and IRRRL loans since 2013.  The loss to the United States taxpayers from IRRRLs going into default, being foreclosed upon, or entering the refunding process is staggering.  Those figures are increasing every day and will continue to do so as Defendants' fraudulent IRRRLs continue to go into default and the VA continues to satisfy its obligations under the guaranties.

331.

The VA could not have lawfully issued a guaranty on any IRRRL known to contain

unallowable and inflated charges in violation of the Limited Charges Rule. *See* 38 C.F.R. § 36.4313.  The VA had no knowledge of Defendants' nationwide systemic and intentional scheme to charge veteran borrowers unallowable and inflated fees in IRRRL closings and falsely certify to the VA to get its guaranties that they were not charging such fees.

<div align="center">332.</div>

The PAR reports also reveal substantial administrative expenses and dollar costs to the U.S. associated with the VA loan program annually. The administrative expenses routinely exceed $100,000,000 per year for VA direct and IRRRL loans. As a subset of those administrative costs, the VA annually calculates administrative costs that are specifically related to defaults processed. Typically, 25% of the total administrative costs are related to defaulted VA loans.

<div align="center">

**IX.  CAUSES OF ACTION**

**COUNT ONE**

(Against Defendant Lenders)

(Submitting or Causing the Submission of False Claims in Violation of 31 U.S.C. § 3729(a)(1) – currently 31 U.S.C. § 3729 (a)(1)(A))

333.

</div>

Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

<div align="center">334.</div>

Defendant Lenders knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims submitted to the VA as guarantor after default on IRRRLs closed and funded by Defendant Lenders who charged prohibited closing costs to veteran borrowers on IRRRLs, in contradiction of false certifications

Defendant Lenders made to the contrary to the VA, as specifically set forth above.

335.

Said false certifications were made by Defendant Lenders with knowledge of their falsity in order to obtain the VA's guaranties of IRRRLs funded by Defendant Lenders.

336.

The VA relied to its detriment on Defendant Lenders' false certifications in issuing guaranties on Defendants' IRRRLs.

337.

Defendants' false certifications were material to the VA's issuing the guaranties on Defendant Lenders' IRRRLs and thus to the claims for payment on the guaranties after default.

**COUNT TWO**

(Against Defendant Lenders)

(Knowingly Making and Using a False Statement or Record Material to a False Claim in Violation of 31 U.S.C. § 3729(a)(2) – currently 31 U.S.C. § 3729(a)(1)(B))

338.

Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

339.

Defendant Lenders made, used, and caused to be made or used, for the purpose of receiving payment or approval from the United States, false records or statements — *i.e.,* closing disclosures replete with false charges, which were submitted to the VA to obtain the VA's guaranties.  The VA issued the guarantees in reliance on the false closing disclosures, which resulted in the VA paying claims submitted after Defendant Lenders' IRRRLs go into default.

340.

Defendant Lenders' knew the closing disclosures were false when they submitted them to the VA to obtain the guaranties.

341.

The false closing disclosures made and used by Defendant Lenders were material to the United States' payment of false claims associated with defaults on Defendant Lenders' IRRRLs.

**COUNT THREE**

(Against Defendant Lenders, Defendant Brokers, and Defendant Title Companies)

(Conspiracy to Violate False Claims Act in Violation of 31 U.S.C. § 3729(a)(3) – currently 31 U.S.C. § 3729(a)(1)(C))

342.

Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

343.

Defendant Lenders, Defendant Brokers, and Defendant Title Companies conspired with one another to submit or cause to be submitted false and fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

344.

Defendant Lenders, Defendant Brokers, and Defendant Title Companies conspired with one another to make and use false records material to false or fraudulent claims allowed and paid by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

345.

Defendant Lenders, Defendant Brokers, and Defendant Title Companies acted in a concerted fashion to defraud the United States and acted with others in keeping the facts

necessary to investigate the fraud and the damages caused by the fraud away from the United States.   Accordingly, Defendant Lenders, Defendant Brokers, and Defendant Title Companies violated 31 U.S.C. § 3729(a)(1)(C).

<div align="center">346.</div>

As a result of the actions of Defendant Lenders, Defendant Brokers, and Defendant Title Companies, the United States has been severely damaged.

<div align="center">

## X.  <u>PRAYER FOR RELIEF</u>

</div>

**WHEREFOR**E, Relator prays for judgment against Defendants as follows:

1.     On Count One under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than $11,181.00 and no more than $22,363.00 per claim as authorized by law, together with all such further relief as may be just and proper; and

2.     On Count Two under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than $11,181.00 and no more than $22,363.00 per claim as authorized by law, together with all such further relief as may be just and proper; and

3.     On Count Three under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties of not less than $11,181.00 and no more than $22,363.00 per claim as authorized by law, together with all such further relief as may be just and proper; and

4.     That Relator be awarded the maximum Relator share amount permissible according to 31 U.S.C. § 3730.

5.     That judgment be granted for the United States of America and Relator and

against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this case, including, but not limited to, all attorneys' fees and costs available pursuant to 31 U.S.C. § 3730(d); and

6.    That the United States and Relator be granted such other and further relief as the Court deems just and proper.

## XI. DEMAND FOR JURY TRIAL

Relator demands a jury trial in this case.

Respectfully submitted this 21st day of September, 2018.

> */s/ Michael J. Moore*
> MICHAEL J. MOORE
> Georgia Bar No. 520109
> CHARLES W. BYRD
> Georgia Bar No. 100850
> AIMEE J. HALL
> Georgia Bar No. 318048
> ELIZABETH S. WHITE
> Georgia Bar No. 258844
>
> POPE, MCGLAMRY, KILPATRICK,
> MORRISON & NORWOOD, P.C.
> 3391 Peachtree Road, NE, Suite 300
> P.O. Box 19337 (31226-1337)
> Atlanta, GA  30326
> (404) 523-7706
> efile@pmkm.com
>
> MARLAN B. WILBANKS
> Georgia Bar No. 758223
> (subject to pro hac vice admission)
> SUSAN S. GOUINLOCK
> Georgia Bar no. 303217
> (subject to pro hac vice admission)
> THOMAS H. WILLOUGHBY
> Georgia Bar No. 960104
> (subject to pro hac vice admission)
>
> WILBANKS & GOUINLOCK, LLP
> 3414 Peachtree Rd., NE, Suite 725

Atlanta, Georgia 30326
(404) 842-1075
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com
thw@wilbanksgouinlock.com

*Counsel for Plaintiff/Relator*