IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

UNITED STATES OF AMERICA, *ex rel.* GEORGE KARTOZIA,

    Plaintiffs,

vs.

FREEDOM MORTGAGE CORPORATION, *et al.*,

    Defendants.

\*
\*
\*
\*
\*
\*
\*

CASE NO. 4:18-CV-194 (CDL)

O R D E R

Relator George Kartozia brought this qui tam action against Defendants under the False Claims Act ("FCA"), which imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). "As an enforcement mechanism, the FCA includes a qui tam provision under which private individuals, known as relators, can sue 'in the name of the [United States] Government' *to recover money obtained in violation* of § 3729." *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1343 (11th Cir. 2021) (alteration in original) (emphasis added) (quoting 31 U.S.C. § 3730(b)(1)). If a relator prevails, he is entitled to retain a percentage of any proceeds as a reward for his efforts. *Id.* § 3730(d).

Relator is a licensed mortgage loan originator who worked for Defendant Service 1st Mortgage, Inc. for a combined total of ten months during 2016 and 2017.  Service 1st, which is owned by Defendant Robert Cole (collectively, "Service 1st"), is a mortgage brokerage firm that refers United States Department of Veterans Affairs ("VA") mortgage refinance loans called Interest Rate Reduction Refinance Loans ("IRRRL") to lenders.  Those lenders included Defendants Freedom Mortgage Corp., RMK Financial Corp., Mortgage Solutions of Colorado, LLC, Sun West Mortgage Co., and Loandepot.com, LLC (collectively, the "Lender Defendants").  Relator alleges that he learned through his work on IRRRLs at Service 1st that the Lender Defendants, working together with Service 1st and two title companies, charged veterans fees that were prohibited by VA regulations, then falsely certified to the VA that they were charging only permissible fees.  Relator also contends that the VA was induced to guarantee 25% of the amount of each IRRRL (up to a cap), which reduced the lenders' risk of loss in the event of a default by a borrower.  And, Relator asserts that some IRRRL borrowers who paid prohibited fees defaulted on their loans.

Each Defendant filed a motion to dismiss.  The Court spent considerable time carefully reviewing Relator's 520-paragraph second amended complaint and the parties' more than 450 pages of briefing.  As discussed in more detail below, Relator's claims

against Freedom Mortgage Corp., Mortgage Solutions of Colorado, LLC, Sun West Mortgage Co., Loandepot.com, LLC, and Certified Title Corp. fail because Relator did not plead with particularity the submission of any actual false claims related to those Defendants. Accordingly, the Court grants those Defendants' motions to dismiss (ECF Nos. 99, 102, 103, 104, 107). Relator does, however, adequately allege FCA claims against RMK Financial Corp., Armour Settlement Services, LLC, and Service 1st. The Court thus denies those Defendants' motions to dismiss (ECF Nos. 101, 105, 106). Relator's motion to strike Defendants' notice of supplemental authority (ECF No. 141) is terminated as moot.

## FACTUAL BACKGROUND

To understand the claims asserted in Relator's complaint, the Court must first explain the IRRRL program. In outlining this program, the Court relies in part on allegations in Relator's second amended complaint (ECF No. 95).

The IRRRL program seeks to help veterans by allowing them to refinance existing VA-backed mortgages on more favorable terms. In keeping with this goal, VA regulations limit the fees and charges that lenders may collect from veterans participating in the IRRRL program. 38 C.F.R. § 36.4313(a). Lenders are not allowed to charge borrowers a "brokerage or service charge or their equivalent" except as permitted by the regulations. *Id.*

3

§ 36.4313(b).    Lenders  may  collect  only  "reasonable  and customary  amounts"  for  "[t]itle  examination  and  title insurance,"  as  well  as  other  enumerated  fees  and  charges.  *Id.* § 36.4313(d)(1).   The  VA  regulations  do  authorize  lenders  to charge  "a  flat  charge  not  exceeding  1  percent  of  the  amount  of the  loan,  provided  that  such  flat  charge  shall  be  in  lieu  of  all other  charges  relating  to  costs  of  origination  not  expressly specified  and  allowed  in  this  schedule."   *Id.* § 36.4313(d)(2). If  a  closing  fee  is  not  in  the  list  of  approved  fees  in § 36.4313(d)(1),  then  it  can  only  be  charged  as  part  of  the  one percent  flat  fee  permitted  by  § 36.4313(d)(2).

IRRRL  loans  to  veterans  are  guaranteed  by  the  VA  if  certain requirements  are  met.  *See generally* 38 U.S.C. § 3710; 38 C.F.R. § 36.4301  (defining  guaranty  as  an  obligation  of  the  United States  "to  repay  a  specified  percentage  of  a  loan  upon  the default  of  the  primary  debtor").    But  "no  loan  shall  be guaranteed  or  insured  unless  the  lender  certifies  to  the Secretary  that  it  has  not  imposed  and  will  not  impose  any charges  or  fees  against  the  borrower  in  excess  of  those permissible  under"  the  regulations.   38 C.F.R. § 36.4313(a).

When  a  lender  closes  an  IRRRL,  it  prepares  a  closing disclosure  statement  listing  all  the  closing  costs  and  fees. All  costs  charged  in  an  IRRRL  closing  must  be  set  forth  in  the closing  disclosure.    After  the  loan  is  closed,  the  lender

submits a closing package to the VA, which includes a certification that the lender has not imposed impermissible fees on the veteran borrower. 2d Am. Compl. ¶¶ 141-142. Based on this certification, the VA automatically issues a guaranty to the lender. *Id.* ¶¶ 40-41. The VA "expressly relies on the Lender's certification of compliance with the limitations on closing costs" and does not review the closing package for each IRRRL. *Id.* ¶ 53. According to Relator, if the VA individually reviewed each IRRRL closing disclosure prior to closing, it would find any prohibited costs and refuse to issue the guaranty. *Id.* ¶ 54; *accord id.* ¶¶ 151-152, 177. Without the lender certification, the VA would not issue the guaranty on an IRRRL. *Id.* ¶¶ 146, 151-152, 177, 209.

Once a lender obtains VA loan guaranties on IRRRLs, the loans are usually sold on the secondary market to holders in due course. According to Relator, there would be no secondary market for the IRRRLs without the VA guaranties. *Id.* ¶ 86. When "a holder in due course holds the IRRRLs, the VA is required by statute and regulation to honor the guaranties corresponding to those loans," and fraud by the lender is not a defense against liability as to a holder in due course. *Bibby*, 987 F.3d at 1345 (citing 38 U.S.C. § 3721 and 38 C.F.R. § 36.4328(a)(1)). Thus, "the guaranties are incontestable vis-à-vis holders in due course," and the "VA must turn to the

originating lender to seek a remedy for that lender's fraud or material misrepresentation—it cannot simply refuse to honor the guaranties." *Id.*

Relator filed this action under the FCA's qui tam provision, alleging the following general facts in his second amended complaint. Relator worked for Service 1st as a loan officer from May 2016 to August 2016 and as a branch manager from May 2017 to October 2017. He asserts that each of the Defendant Lenders charged veterans impermissible fees on IRRRLs that were brokered by Service 1st and closed by either Armour Settlement Service, LLC ("Armour") or Certified Title Corp. ("Certified") (collectively "Title Defendants"). For each IRRRL, the Lender Defendant prepared closing disclosures that contained at least one charge not permitted by the VA regulations. These impermissible charges included broker fees that exceeded the one percent origination fee permitted by 38 C.F.R. § 36.4313(d)(2) and were falsely listed as discount points; duplicative, false, and unreasonable title fees; and inflated recording fees and taxes.

Relator alleges that by collecting prohibited fees from veterans and concealing them on the closing disclosures, and by falsely certifying their compliance with VA regulations, the Lender Defendants induced the VA to issue guaranties for the IRRRLs. The VA would not have issued a guaranty on any IRRRL

that contained unallowable fees, inflated charges, or fake discount points.  If an IRRRL borrower defaults on the loan, the holder of the loan may submit a claim on the VA guaranty.

In addition to the general allegations regarding how the Lender Defendants and Title Defendants worked with Service 1st to generate and close IRRRLs, the second amended complaint contains examples of at least one IRRRL by each Lender Defendant that was brokered by Service 1st and closed by one of the Title Defendants.  These examples include eight loans made by Defendant RMK Financial Corp. ("Majestic"), seven of which were closed by Armour and one of which was closed by Certified.  2d Am. Compl. ¶¶ 225, 246, 269, 291, 313, 405, 427, 450.  The borrowers on three of those loans (all closed by Armour) defaulted.  *Id.* ¶¶ 334-336, 425-426, 446-448.  The examples also include one loan each for Defendants Freedom Mortgage Corp. ("Freedom"), Loandepot.com, LLC ("Loan Depot"), Mortgage Solutions of Colorado, LLC ("Mortgage Solutions"), and Sun West Mortgage Company, Inc. ("Sun West").  *Id.* ¶¶ 167-173, 337, 358, 382.  There is no allegation that any of the borrowers for these four loans defaulted.

Relator's complaint contains three counts.  First, Relator contends that Defendants violated 31 U.S.C. § 3729(a)(1)(A)—the Lender Defendants by knowingly presenting false guaranty applications to the VA and the Title Defendants and Service 1st

by knowingly causing these false guaranty applications to be presented to the VA. 2d Am. Compl. ¶ 501. Second, Relator alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly preparing or helping to prepare false closing disclosures that were submitted to the VA with IRRRL guaranty applications. *Id.* ¶¶ 507-508. Third, Relator asserts that Defendants violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to present false claims supported by false closing disclosures. *Id.* ¶¶ 515-517.

DISCUSSION

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The Act "is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020) (quoting *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014)). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Id.* (quoting *Urquilla-Diaz v.*

8

*Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015)).   Defendants make dozens of arguments in support of their motions to dismiss. The starting point, of course, is whether Relator adequately alleged a false claim under the pleading rules.

## I.   Pleading Standards for False Claims Act Cases

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible where the facts alleged permit the court to reasonably infer that the defendant's alleged misconduct was unlawful." *Urquilla-Diaz*, 780 F.3d at 1051. "Factual allegations that are 'merely consistent with a defendant's liability,' however, are not facially plausible." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz*, 780 F.3d at 1051.   Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R.

Civ. P. 9(b).   "To satisfy this heightened-pleading standard in a False Claims Act action, the relator has to allege 'facts as to time, place, and substance of the defendant's alleged fraud,' particularly, 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Urquilla-Diaz,* 780 F.3d at 1052 (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002)).

"The complaint also must offer "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the [g]overnment." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (alterations in original) (quoting *Clausen*, 290 F.3d at 1311). The relator cannot merely describe "a private scheme in detail" and allege generally "and without any stated reason . . . his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted." *Id.* (alterations in original) (quoting *Clausen*, 290 F.3d at 1311).  "Nor may he point to 'improper practices of the defendant[]' to support 'the inference that fraudulent claims were submitted'" because submission of a claim for payment cannot be "inferred from the circumstances." *Id.* (alterations in original) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005)).  Rule 9(b)'s particularity requirement

"guards against 'guilt by association.'"  *Clausen*, 290 F.3d at 1308 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994)).  The particularity requirement "is a nullity" if a relator "gets a ticket to the discovery process without identifying a single claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quoting *United States v. Lab. Corp. of Am.*, No. 1:97CV2200TWT, 2001 WL 1867721, at *1 (N.D. Ga. May 16, 2001)). In summary, a relator "must allege 'specific details' about false claims to establish 'the indicia of reliability necessary under Rule 9(b).'"  *Carrel,* 898 F.3d at 1276 (alterations in original) (quoting *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010) (per curiam)).

## II. Relator's Claims Against Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified

Relator's complaint contains examples of one IRRRL each for Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified.  2d Am. Compl. ¶¶ 167-173, 337, 358, 382, 450. Relator does not allege that he was personally involved in any of these loans, that the borrowers on any of these loans defaulted, or that the VA incurred any expenses to resolve defaults for these borrowers.  Relator nonetheless argues that his complaint provides enough specific details about false claims by these companies to establish the required indicia of reliability.  As discussed below, it does not.

A.   "Presentment" Claims

Relator's claims under 31 U.S.C. § 3729(a)(1)(A)—his "presentment" claims—are based on his allegations that (1) the Lender Defendants submitted false claims to the VA when they applied for loan guaranties certifying that they were charging only permissible fees when they were not and (2) the Title Defendants and Service 1st caused these false guaranty applications to be submitted to the VA.   Liability for a presentment claim only arises from "submission of a false claim to the government."[1]   *Ruckh*, 963 F.3d at 1103 (quoting *Urquilla-Diaz*, 780 F.3d at 1045).   In a false certification case like this one, the relator "must prove '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"   *Id.* (quoting *Urquilla-Diaz*, 780 F.3d at 1045).

The Eleventh Circuit has repeatedly emphasized that the submission of an actual claim to the government for payment is the "sine qua non" of an FCA violation.   *Ruckh*, 963 F.3d at 1103 (quoting *Urquilla-Diaz*, 780 F.3d at 1045); *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (quoting *Clausen*, 290 F.3d at 1311).   "Without

---

[1] This rule applies whether the claim is that an entity itself presented a false claim or that the entity caused a false claim to be presented.   *See Ruckh*, 963 F.3d at 1107 (explaining causation standard for "cause to be presented" claims).

the presentment of a claim, there is simply not actionable damage." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1353 (11th Cir. 2006) (cleaned up) (quoting *Clausen*, 290 F.3d at 1311). The FCA "does not create liability merely for [an entity's] disregard of Government regulations or improper internal policies unless, as a result of such acts, the [entity] knowingly asks the Government to pay amounts it does not owe" or forfeit money that it is due. *Id.* (quoting *Clausen*, 290 F.3d at 1311); *Urquilla-Diaz*, 780 F.3d at 1052.

Here, Relator argues that an IRRRL lender's application for a loan guaranty is an actionable claim because each guaranty is incontestable vis-à-vis a holder in due course. But Relator did not point the Court to any binding precedent allowing an FCA presentment claim in the absence of a sufficiently reliable allegation that the Government was actually induced to pay money or forfeit money due. The FCA itself defines "claim" as "any request or demand . . . for money or property" that "is presented to an officer, employee, or agent of the United States" or made to another recipient "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government" provides or reimburses the money requested. 31 U.S.C. § 3729(b)(2). Moreover, the relevant caselaw—including the cases Relator relies upon—establishes that in the loan

13

guaranty context, there is no actionable FCA presentment claim until the borrower defaults and the Government is faced with a demand for money.

The Supreme Court made it clear that an application for credit insurance under a federal program is *not* a "claim" within the meaning of the FCA. *United States v. McNinch*, 356 U.S. 595, 599 (1958).[2]  Why?  In agreeing to provide credit insurance, the Government "disburses no funds nor does it otherwise suffer immediate financial detriment." *Id.* at 599.  Instead, it contracted "to reimburse the lending institution in the event of future default, [if] any." *Id.*  In *McNinch*, there had been no default, so there was no "claim." *Id.* at 598.  The Supreme Court expressed no view "as to whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a 'claim' covered by the False Claims Act." *Id.* at 599 n.6.  The Supreme Court later explained, though, that an actionable presentment claim exists in a case involving "a false statement made with the purpose and effect of inducing the Government *immediately to part with money*" because the purpose of the FCA is to protect the Government's funds and property from fraudulent claims. *United*

---

[2] The version of the FCA applicable in *McNinch* was worded differently than it is today, but it still prohibited presentment of "any claim" for payment of approval "upon or against the Government of the United States." *Rainwater v. United States*, 356 U.S. 590, 591 n.1 (1958) (citing R.S. § 5438 (1878), now codified as amended in 31 U.S.C. § 3729)); *accord McNinch*, 356 U.S. at 596 n.1.

*States v. Neifert-White* Co., 390 U.S. 228, 232-33 (1968) (emphasis added).  So, submission of a fraudulent loan application to the Government is actionable when the Government approves the loan and disburses the funds.

Relying primarily on *Niefert-White* and two out-of-circuit cases, Relator contends that the application for an incontestable guaranty is a request for payment within the meaning of the FCA, even in the absence of a default on the guaranteed loan.  The Court disagrees.  In *Niefert-White*, the fraudulent loan application was a "claim" because it immediately induced the Government to part with funds.  390 U.S. at 233.  In *United States v. Van Oosterhout*, 96 F.3d 1491 (D.C. Cir. 1996), the United States brought a claim for monies *paid out* under Small Business Administration loan guaranties when the borrower defaulted on its obligation.  Similarly, in *United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995), the United States brought a claim for mortgage loan insurance benefits *paid by* the Department of Housing and Urban Development following a borrower's default.  Nothing in these cases suggests that simply obtaining a loan guaranty by fraudulent means is an actionable claim within the meaning of the FCA.  Instead, it is clear that a claim does not become actionable until the Government is induced to suffer immediate financial harm, not some possible future harm.  *Cf. Bibby*, 987 F.3d at 1344 (addressing FCA claim

15

against IRRRL brokers "to recover the money the VA had paid when borrowers defaulted on [defendant]-originated loans").

Here, Relator alleges that he "reviewed thousands of closing packages of IRRRLs brokered by Defendant Service 1st that contained examples of closing disclosures created by each Defendant Lender" and closed by one of the Title Defendants. 2d Am. Compl. ¶ 6. He claims that he "saw hundreds of examples of IRRRLs . . . originated by Defendant Lenders and closed with falsely inflated, prohibited closing costs." *Id.* Despite this extensive review, Relator provided examples of only one IRRRL each for Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified. 2d Am. Compl. ¶¶ 167-173, 337, 358, 382, 450. Again, Relator does not allege that he was personally involved in any of these loans, that the borrowers on any of these loans defaulted, or that the VA incurred any expenses to resolve defaults for these borrowers. Rather, Relator makes general allegations regarding the total VA loan guaranty payments for all types of VA loans, the average loan guaranty amount for all IRRRLs, the market share held by each Defendant Lender for VA mortgage loans, and the default rate for all VA loans between 2013 and 2019. *Id.* ¶¶ 183-186, 189. Extrapolating from those general numbers, Relator estimates that a percentage of each Lender Defendant's IRRRLs "have or will go into default" and

that the VA may have to pay claims on guaranties for those IRRRLs. *E.g.*, *Id.* ¶¶ 186, 189.

The problem with Relator's approach is that it does not allege with particularity or the required indicia of reliability that a specific fraudulent claim was in fact submitted to the Government for any IRRRLs closed by Certified or made by Freedom, Loan Depot, Mortgage Solutions, and Sun West. A relator cannot "rely on mathematical probability to conclude" that an actual false claim must have been submitted at some point. *Carrel*, 898 F.3d at 1277. "It is not enough to point to improper practices of the defendant to support the inference that fraudulent claims were submitted because submission cannot be inferred from the circumstances." *Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496, 501 (11th Cir. 2021) (per curiam) (cleaned up) (quoting *Carrel*, 898 F.3d at 1275). Relator's broad allegations that each Defendant Lender fraudulently obtained guarantees on every IRRRL that was brokered by Service 1st between October 2015 and June 2020 does not establish that the Government had to pay amounts it did not owe or that there was "actionable damage to the public fisc as required under the" FCA. *Carrel*, 898 F.3d at 1278.

Relator nonetheless contends that he is not required to allege an actual sample fraudulent claim because he has personal

knowledge of Defendants' fraudulent conduct. A sample fraudulent claim is not required if the relator alleges personal knowledge of or participation in the fraudulent conduct that gave rise to a false claim. In *Ruckh*, for example, the Eleventh Circuit concluded that the relator had sufficient personal knowledge of conduct that led to false claims because she personally witnessed it, was transferred after complaining about it, and found more than a hundred examples in an audit. 963 F.3d at 1105. Here, in contrast, Relator does not allege any personal knowledge or level of participation giving rise to an indicia of reliability for his bald assertion that false claims must have been submitted to the VA in connection with IRRRLs closed by Certified or made by Freedom, Loan Depot, Mortgage Solutions, and Sun West. Moreover, there is simply no allegation that any of these loans went into default or that the VA has otherwise paid anything in reliance upon the alleged false certifications. In this context, "submission of a claim" for FCA purposes requires the occurrence of a default accompanied by the presentation to the VA of a claim under its guaranty, which claim causes the VA to make some payment related to the claim. Thus, Relator's presentment claims against Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified must be dismissed for failure to allege an actionable claim.[3]

---

[3] The Court understands that sometimes a plaintiff faces an

B.   "Make-or-Use" Claims

Relator argues that even if his presentment claims against Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified fail because he did not adequately allege that these Defendants submitted an actual false claim to the VA, he still states a claim under 31 U.S.C. § 3729(a)(1)(B), which imposes liability on a defendant who makes or uses "a false record or statement material to a false or fraudulent claim."  Relator correctly points out that § 3729(a)(1)(B) does not require the *defendant* to *present* a claim *to the Government*.  Relator suggests that no actual claim is required at all to impose liability under § 3729(a)(1)(B).

It is clear that for "make-or-use" claims that accrued before Congress enacted the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617, a relator was required to allege "that a specific fraudulent claim was in

_____

insurmountable burden when the specific evidence upon which the claim is based is within the exclusive control of the defendant, and thus the plaintiff's ability to allege specific facts may be restricted. In that situation, the Court must determine whether the plaintiff has alleged enough such that it is plausible that discovery will yield evidence in support of the claim.  But here, there is no allegation that any particular loan from these Defendants is in default or that the VA has made any payment pursuant to its guarantees.  Furthermore, the Court observes that the real party in interest in this action is the Government, which presumably could have discovered during its investigation whether particular VA loans defaulted.  Yet after that investigation, it chose not to intervene, and no credible explanation has been provided as to why Relator could not have alleged specific defaults in his complaint.  The Court must conclude that no such defaults occurred regarding these Defendants' loans, which explains why Relator argues that default is legally unnecessary. But as explained, he is wrong on this point.

fact submitted to the government" and that "the government in fact paid a false claim." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1328-29 (11th Cir. 2009). That is because the pre-FERA FCA proscribed false statements made "to get a false or fraudulent claim paid or approved by the Government." *Id.* at 1327 (citing 31 U.S.C. § 3729(a)(2) (2003)). The false claims alleged in *Hopper* occurred before FERA went into effect, so the Eleventh Circuit did not consider whether payment of the actual claim was required for post-FERA conduct. *Id.* at 1329 n.4. But the Eleventh Circuit did note that if the Government "has not paid funds it does not owe, it has suffered no loss. To impose liability in such a case would do nothing to protect the government from loss due to fraud, and it would extend liability beyond the 'natural, ordinary and reasonable consequences' of a defendant's conduct." *Id.* at 1328-29.

With FERA, Congress changed the requirements for a "make-or-use" claim to forbid false statements or records "material to a false or fraudulent claim." FERA § 4(a)(1), 123 Stat. at 1621 (codified at 31 U.S.C. § 3729(a)(1)(B)). Congress added a definition of "claim": "any request or demand . . . for money or property" that "is presented to an officer, employee, or agent of the United States" or made to another recipient "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United

States Government" provides or reimburses the money requested. *Id.* § 4(a)(2), 123 Stat. at 1622-23 (codified at 31 U.S.C. § 3729(b)(2)). Congress also added a definition of "material": "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 4(a)(2), 123 Stat. at 1623 (codified at 31 U.S.C. § 3729(b)(4)).

The purpose of these changes was "to clarify and correct erroneous interpretations of the law" that required the Government (or a relator) to prove that the defendant intended the Government itself pay the claim for there to be a violation. S. Rep. No. 111-10, at 10 (2009), 2009 U.S.C.C.A.N. 430, 438. Under that interpretation, there would be no liability in certain contexts where the false claim was not submitted directly to the Government but to a contractor. *Id.* According to the Senate Report, this interpretation was "contrary to Congress's original intent in passing the law and create[d] a new element in a FCA claim and a new defense for any subcontractor that [was] inconsistent with the purpose and language of the statute." *Id.* Neither FERA itself nor the Senate Report suggests that FERA erased the actual claim requirement for make-or-use claims.

While there is no published Eleventh Circuit opinion squarely addressing whether a relator must plead with

particularity an actual claim paid by the Government to establish liability under § 3729(a)(1)(B), a panel of the Eleventh Circuit recently concluded that a make-or-use claim requires an actual false claim for payment. *Helmly*, 853 F. App'x at 503. Based on that decision, along with the Eleventh Circuit's admonition that FCA liability does not extend to cases where the Government has not paid funds it does not owe and thus suffered no actionable loss, the Court finds that a make-or-use claim under § 3729(a)(1)(B) requires an actual false claim for payment. As discussed above in § II.A, Relator failed to plead with particularity and the required indicia of reliability that any such false claim was submitted to the Government in connection with IRRRLs by Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified. Accordingly, Relator's make-or-use claims against Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified must be dismissed.

C.   Conspiracy Claims

In addition to his presentment and make-or-use claims, Relator asserts conspiracy claims against all Defendants. The FCA imposes liability on any person who "conspires to commit a violation of" § 3729(a)(1)(A) and § 3729(a)(1)(B). 31 U.S.C. § 3729(a)(1)(C). As discussed above, an actual false claim for payment is required to establish a claim under both § 3729(a)(1)(A) and § 3729(a)(1)(B), and Relator has not

22

adequately alleged an actual false claim against Freedom, Loan
Depot, Mortgage Solutions, Sun West, and Certified.   His
conspiracy claim against these Defendants fails.  *See Corsello*,
428 F.3d at 1014 (noting that an element of a conspiracy claim
is damage to the Government due to a false claim).

**III. Relator's Claims Against Majestic, Service 1st, and Armour**

In contrast to his allegations against the other
Defendants, Relator does allege that the borrowers on three
loans brokered by Service 1st, made by Majestic, and closed by
Armour defaulted.   Relator also alleges with specificity that
the VA expended funds in connection with two of these IRRRLs
because the VA purchased both homes following a foreclosure
sale.  2d Am. Compl. ¶¶ 425-426, 446-447; 2d Am. Compl. Ex. 16,
Trustee's Deed (Apr. 10, 2018), ECF No. 95-16; 2d Am. Compl. Ex.
18, Trustee's Deed (Jan. 19, 2018), ECF No. 95-18.  Service 1st,
Majestic, and Armour (collectively, "Defendants") argue that
these representative examples are still not enough to survive a
motion to dismiss.

First, Defendants argue that Relator did not allege that
Defendants knowingly made any false statement or caused one to
be made.   But he did.   Relator alleges that the closing
disclosure for both loans contained inflated and duplicative
title fees and recording fees that far exceeded the reasonable
and customary rates and thus were not allowed under the

applicable regulations.    2d Am. Compl. ¶¶ 412-415, 434-436; *accord id.* ¶ 122.    Relator further alleges that Majestic submitted guaranty application forms to the VA which falsely certified Majestic had complied with the limited charges rules even though it knew it had not.  *Id.* ¶¶ 416-418, 437-439.  And he alleges that Majestic, Service 1st, and Armour formed a symbiotic relationship to charge impermissible fees to veterans but falsely certify to the VA that no such impermissible fees had been charged.

As an employee and branch manager of Service 1st, Relator had firsthand knowledge of the scheme.  As alleged, Majestic used Service 1st to identify potential borrowers and market IRRRLs to them.  *Id.* ¶ 92.  Service 1st nominated a title company to perform each IRRRL closing.  *Id.* ¶ 121.  Robert Cole of Service 1st mandated that Service 1st's brokers use one of three title companies—including Armour—because those companies would pay for direct mail advertising for the broker in exchange for settlement service referrals.  *Id.* ¶ 123.  The title companies, including Armour, knowingly overcharged for title fees and paid for Service 1st's marketing costs, which resulted in a higher volume of IRRRLs for lenders like Majestic.  *Id.* ¶¶ 123-125, 130.  Naftali Raphaely of Armour told Relator that the key to success was to build a close relationship with a title company that was willing to pay the marketing costs that

could lead to more loans.  *Id.* ¶ 127.  Robert Cole instructed Relator to look the other way on the inflated and false title fees, telling him that "no one was going to stop the gravy train to complain about a few hundred dollars of misplaced title fees."  *Id.* ¶¶ 125-126.  Relator worked primarily with an account executive named Jason Kim from Majestic, and Relator learned from him that Majestic knew that the title fees charged by Armour on IRRRLs were falsely inflated.  *Id.* ¶¶ 114, 122. Majestic included those false and inflated title fees on its closing disclosures anyway and then submitted guaranty applications to the VA falsely certifying that it had not charged any impermissible fees.  Armour and Service 1st knew that these false and inflated fees would be included in Majestic's closing disclosures that were submitted to the VA in connection with a guaranty application.  *Id.* ¶ 100.  Based on these allegations, the Court finds that Relator adequately alleged that Majestic knowingly presented a false certification to the VA, that Armour and Service 1st knowingly caused a false certification to be presented to the VA, that all three Defendants knowingly made or used (or caused to be made or used) a false record or statement material to a false claim, that these Defendants knew that the VA would issue a guaranty of the loans in reliance upon the false certification, and that these

Defendants knew that if the loans defaulted the VA would have to make some payment pursuant to the loan guaranty.

The Court understands that the causation standard for a "cause to be presented" claim is whether there is a sufficient nexus between the defendant's conduct and the submission of a false claim. *See Ruckh*, 963 F.3d at 1107. A "defendant's conduct may be found to have caused the submission of a claim" if the conduct was a substantial factor in inducing the claimant to submit claims for payment and the submission of claims for payment was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Id.* The Court also understands that this causation standard has only been examined in slightly different contexts, like the context of a management company that knowingly caused a doctor to submit false Medicare claims for reimbursement. And, the Court understands that Armour and Service 1st argue that they cannot be liable on a "cause to be presented" claim or a "cause to use a false record" claim because they did not actually complete any forms or documents that were submitted to the VA, because the forms that were submitted to the VA only contained a certification by the lender, and because (according to them) there were no unallowable fees. But, as discussed above, taking the allegations as true and drawing all reasonable inferences in Relator's favor, Relator adequately alleges that (1) Service 1st

recruited Armour to close the loans because it knew Armour would charge unallowable fees and provide free marketing for Service 1st, (2) Armour did charge unallowable fees, (3) Majestic included those unallowable fees on the closing disclosures as intended by Service 1st and Armour because Majestic knew that doing so would incentivize Service 1st and Armour to generate more loans for Majestic, (4) Majestic submitted a guaranty application and closing disclosure for each IRRRL despite its knowledge of Armour's unallowable fees, (5) Majestic knew that the VA would guarantee the loan and become liable in the event of a borrower default, (6) Armour and Service 1st knew that Majestic would submit guaranty applications and closing disclosures to the VA to induce the VA to issue guaranties, and (7) at least two borrowers defaulted and caused the VA as guarantor to make payments it would not have owed absent the guaranty that was induced by fraudulent means.  Reading all of these allegations together, the Court is satisfied that Relator plausibly alleges "cause to be presented" and "cause to make or use documents material to a claim" claims against Armour and Service 1st.

Defendants argue that even if Relator adequately alleged a false statement made with scienter, he did not sufficiently allege materiality.  He did.  In *Bibby*, a qui tam action regarding IRRRL loan guaranty applications like the ones here,

the Eleventh Circuit analyzed whether the relators presented enough evidence of materiality to survive summary judgment and concluded that they had. *Bibby*, 987 F.3d at 1347-52.  In the Court's view, *Bibby* is indistinguishable binding precedent that mandates the conclusion that Relator in this action adequately alleged materiality.

Material "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C.A. § 3729(b)(4); *accord Bibby*, 987 F.3d at 1347 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016)).  The "factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior."  *Bibby*, 987 F.3d at 1347.

The Eleventh Circuit concluded that in the IRRRL context, the first factor "weighs in favor of materiality."  *Id.*  A "lender's truthful certification that it charged only permissible fees was a condition of" the VA's issuance of the loan guaranties and thus the Government's expenditure of funds following a borrower's default, such as the "payment on IRRRL guaranties."  *Id.*  That is because the "relevant VA regulation

clearly designates that requirement as a condition to payment: 'no loan shall be guaranteed or insured unless the lender certifies that it has not imposed and will not impose any impermissible charges or fees." *Id.* (cleaned up) (quoting 38 C.F.R. § 36.4313(a)).

The Eleventh Circuit found that the second factor also weighs in favor of materiality because "a reasonable factfinder could conclude that the VA's fee regulations were essential to the bargain with IRRRL lenders." *Id.* at 1348. Here, Relator's allegations track the evidence presented by the *Bibby* relators: he alleges that the aim of the IRRRL program was to help veterans stay in their homes, and he cites the same VA Pamphlet 26-7 that the *Bibby* relators relied upon. That Pamphlet provides that the limits on charges and fees "and the concomitant certification by the lender as to its compliance with this requirement furthers the purpose" of limiting the fees a veteran must pay to obtain a loan and ensures that each veteran borrower can effectively use the home loan benefit. *Id.* (citing VA Pamphlet 26-7).

The third factor is the effect on the VA's behavior. The basic rule is that if the Government regularly refuses to pay claims based on noncompliance, that is evidence of materiality; if the Government regularly pays claims despite actual knowledge that the claimant violated its requirements, then the

requirements are not material. *Id.* So, if the Government had actual knowledge that a lender violated its certification requirements, the next question is whether the Government's reaction demonstrates that the false certification was material. *Id.* at 1350. In *Bibby*, for example, there was evidence that the VA knew from audits that the lender had violated IRRRL requirements for a percentage of loans and that the VA issued loan guaranties despite its knowledge of the audit findings. *Id.* at 1350-51. But the relators in *Bibby* pointed to evidence that the VA "took a number of actions to address noncompliance with fee regulations"—including reminders regarding applicable policies, more frequent and more rigorous audits, and requiring refund of any improperly charged fees that the VA discovered. *Id.* 1351-52. Based on this evidence, the Eleventh Circuit found a genuine fact dispute on materiality. *Id.* at 1352.

Here, there is no allegation that the Government had actual knowledge that Majestic was charging veterans impermissible fees while certifying that it had not done so, and there is no allegation that the Government had actual knowledge that Service 1st and Armour participated in the scheme. Thus, on the record before the Court at this stage in the litigation, the third factor does not weigh against a finding of materiality.[4] In

---

[4] If discovery reveals that the VA had actual knowledge of violations by Majestic, Service 1st, and Armour, the Court would have to consider

summary, Relator's complaint does not contain any allegations that would defeat materiality.

Finally, Defendants assert that even if Relator adequately alleged materiality, his claims still fail because the VA did not pay a guaranty claim in connection with either defaulted loan referenced in the complaint.  Instead, Relator alleges that the VA, as guarantor of the loans, purchased both homes following foreclosure sales.  The Court is not convinced that this distinction makes a difference.  The Eleventh Circuit in *Bibby* noted that the relators' action was "to recover the money the VA had paid when borrowers defaulted on" loans originated by the defendant.  *Id.* at 1344.  And here, Relator clearly alleges that the Defendants' false certifications and fraudulent course of conduct caused the Government to pay out money it would not otherwise have paid.  The Court finds that these payments based on the VA guarantees which were induced by Defendants' false statements are sufficient to satisfy this element of Relator's claim.

For all these reasons, the Court concludes that Relator plausibly stated FCA presentment and make-or-use claims against Majestic, Service 1st, and Armour.  The Court also finds that Relator's complaint states an FCA conspiracy claims against these three Defendants because Relator alleges with

---

evidence regarding any action taken by the VA to address noncompliance.  *See Bibby*, 987 F.3d at 1351-52.

particularity the scheme the three companies and Robert Cole employed to commit their presentment and make-or-use violations, he alleges specific actions that each Defendant took to further the object of the conspiracy, and he alleges that the United States suffered damages as a result of Defendants' false claims.

CONCLUSION

The Court grants the motions to dismiss filed by Freedom, Loan Depot, Mortgage Solutions, Sun West, and Certified (ECF Nos. 99, 102, 103, 104, 107), and denies the motions to dismiss filed by Majestic, Armour, and Service 1st (ECF Nos. 101, 105, 106).[5]

IT IS SO ORDERED, this 8th day of October, 2021.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[5] As to Relator's general request in his briefing that he be allowed to amend his Complaint if the Court finds that all or part of it fails to state a claim, the Court is in no position to grant such a request when the substance of the proposed amended complaint has not been presented for the Court's consideration. *See Atkins*, 470 F.3d at 1362.